STATE, Appellant, v. BOARD OF COM'RS. OF BEADLE, COUNTY, Respondent.

(222 N. W. 583.)

(File No. 6408.  Opinion filed December 20, 1928.)

*Buell F. Jones,* Attorney General, and *R. F. Drewry* and *E. D. Roberts,* Assistant Attorney General, for the State.

*J. C. McCoy,* of Longview, Wash., for Respondent.

CAMPBELL, J. By the provisions of chapters 333 and 334, Laws 1917, enacted pursuant to an amendment to section 1, art. 13, Constitution South Dakota (proposed by chapter 233, Laws 1915), adopted by popular vote at the November, 1916, election, the people of this state decided to engage the state, as a governmental function, in the business of loaning money upon real estate security. The objects and purposes underlying this extension of governmental function have been stated in a previous decision of this court in the following language:

"* * * Knowing that the development of the potential resources of this state depends to a great extent upon the cheapness of the money needed therefor, and further believing that such money could be furnished to the people at a lower rate of interest if procured through the medium and backed by the credit of the state, the people, in the exercise of the plenary power in them vested, amended their compact so as to allow the state to 'establish and maintain a system of rural credits and thereby loan money and extend credit to the people of this state upon real estate security in such manner and upon such terms and conditions as may be prescribed by general law.' " Opinion of the Judges (1917) 38 S. D. 635, at page 642, 162 N. W. 536, 539.

The system thus inaugurated is commonly referred to in this state as "Rural Credits" and the constitutionality of the venture has

been twice considered and approved by this court. In re Opinion of the Judges, supra; Schaaf v. South Dakota Rural Credits Board (1917) 39 S. D. 377, 164 N. W. 964. The general scheme was that the state of South Dakota would borrow money upon its general faith and credit by the sale of bonds, which money would be re-loaned by the state to individual owners of agricultural land, for certain purposes and subject to certain restrictions. Such loans would be secured by first mortgage upon such land at an interest rate not less than three-fourths of 1 per cent nor more than 1½ per cent in excess of the interest rate contracted to be paid by the state upon its bonds, and would be upon an amortization plan, with annual or semi-annual installments sufficient to terminate the debt at an agreed period of not less than 5 nor more than 30 years from the date of the loan. It was contemplated that the amortization payments so received by the state would be sufficient to meet the amounts required to be paid by the state from time to time to retire the bonds issued and the differential between the interest rate paid by the state on its bonds and the interest rate received by the state upon the loans would provide for operating expenses and con-tingencies. Thus the cycle might proceed indefinitely and the re-sources of the state could be developed by the use of money at an appreciably lower rate than was elsewhere or otherwise obtainable. So attractive did the plan appear that it was apparently somewhat by way of an afterthought that the Legislature, having inaugurated the scheme by chapter 333, Laws 1917, approved with an emer-gency clause on February 26, 1917, subsequently enacted chapter 334 of the same session, approved March 8, 1917, amending sec-tion 14 of chapter 333 by providing in the following words for the contingency that at some time there might not be sufficient funds in the rural credits treasury to pay bonds or warrants or interest thereon at maturity:

"If at any time there shall not be sufficient funds in the treas-ury of the South Dakota Rural Credit Board to pay the said bonds or warrants or interest thereon at maturity thereof, or when same shall become due, it shall be the duty of the Tax Commission of this state, upon request of said Board, to make a special assessment and levy immediately to pay same when due, which levy shall be collected in the same manner as other tax levies made by said Com-mission."

In considering the matter in May, 1917 (Opinion of the Judges, supra, 38 S. D. 635, 162 N. W. 536), at least three of the then members of this court entertained the view that chapter 334, Laws 1917, merely designated "a contingency under which a debt against the state will arise" and optimistically opined:

"* * * When one considers the provisions of these two acts —the class and amount of security required for loans made by the board, the opportunity given the board to arrange so that the maturity of loans will meet or antedate the maturity of bonds and warrants, the margin between interest paid by and that received by the board—such contingency is reduced to but a remote possibility."

However, in the expressive phrase of Lord Bryce, "Many doctrines once held irrefragable need to be modified in the light of supervenient facts," and in this case many of the hopes entertained for the rural credit scheme at its inception have been disappointed, and supervenient facts have brought us face to face with realization of the "remote possibility" above mentioned. Whether we have so arrived because of inherent defects in the nature of the project, or because of faulty operation, or by reason of general and unforeseeable economic conditions, or by the conjoint operation of all those factors, has afforded and continues to afford a fertile field for speculation and argument in our state; but those are matters with which in this case we have, and can have, no possible concern. Whatever the causes and however varied they may be, and however much opinions may differ as to what they are, the fact remains that rural credit operations in this state at the present time are not self-sustaining and have not been. There have been many failures to make payments and comply with the terms and conditions of the mortgages, and the state has been obliged to take over a great amount of real estate by foreclosure, and there are outstanding at the present time rural credit bonds, general obligations of this state, in the amount of $45,000,000 at varying interest rates and upon various maturities.

Section 5, art. 11, Constitution South Dakota, provides as follows:

"The property of the United States and of the state, county and municipal corporations, both real and personal, shall be exempt from taxation."

Section 20 of the original Rural Credits Act (chapter 333, Laws 1917, carried into the Revised Code of 1919 as section 10168) reads as follows:

"All mortgages, real and other property taken by such board in its business of loaning, and all warrants or bonds issued by such board in the transaction of its business, shall be free from all general taxes, state, county and municipal, and shall not be subject to state income tax."

The state of South Dakota, by foreclosure of a rural credit mortgage, acquired title to a quarter section of land in Beadle county and thereafter applied to the commissioners of that county for abatement of taxes upon the tract, upon the ground of state ownership, as to all taxes levied after title vested in the state by sheriff's deed. The county commissioners rejected such application, whereupon the state appealed from their decision to the circuit court of Beadle county, S. D. Upon the trial the court made findings of fact and conclusions of law in substance sustaining the action of the county commissioners and holding that said land was not exempt from taxation. Judgment was thereon entered to the effect that the taxes so levied and assessed against said tract constituted a legal and valid tax thereon, and from that judgment, and from an order denying its motion for new trial, the state has appealed.

This court has previously held that the mere existence of a rural credit mortgage upon a tract of land, accompanied by the failure of the landowner to pay taxes thereon levied, did not mean that the taxes need not be paid, and without specifically determining the question of superiority between tax liens and the lien of a rural credit mortgage nevertheless held, under such circumstances, as a matter of public policy, that it was the duty of the rural credit board, inasmuch as it had the power, to pay the taxes when the same became delinquent. Hughes County v. Henry (1925) 48 S. D. 98, 202 N. W. 286. The instant case presents squarely the question of whether or not land incumbered by a rural credit mortgage continues subject to taxation after default in the conditions of the mortgage, foreclosure thereof, and the vesting of legal title to the land in the state of South Dakota.

The question is essentially public in its nature since, in view of present conditions and the fact that rural credit operations are

not now self-sustaining, there are aligned upon the one side the interests of all taxpayers, citizens of the state as a whole, and upon the other the interests of all taxpayers as such in the local taxing districts where such foreclosed land is geographically situated.

The practical results that hinge upon the determination of this question may best be understood by a consideration of some figures furnished to us by the commissioner of taxation of this state from the reports and records of his department and by the rural credit commissioner from the files and records of his department. From those sources we are informed that in the year 1927, of the total tax burden imposed pursuant to law in the state of South Dakota, 71.2 per cent was imposed upon agricultural lands. The total acreage taxed was approximately 37,440,899. The average tax burden for all purposes on agricultural land exclusive of structures throughout the state in the year 1927 amounted to 64 cents per acre, and the average levy upon agricultural land throughout the state for all tax purposes was 20.45 mills per dollar of valuation. Of this average total levy of 20.45 mills there was levied for all state purposes 2.66 mills, and for local tax purposes such as township, county, and school 17.79 mills, the levy being thus divided approximately 13 per cent for all state purposes and 87 per cent for local purposes. In other words, of the average 64 cents per acre tax payable by agricultural land in 1927 approximately 8 cents per acre would go to the state of South Dakota for state purposes, including general expense, state debt retirement, etc., and the remaining 56 cents per acre would go to the local taxing districts (county, township, school, etc.) for local purposes. The department of rural credits since its inception, as we are advised, has made loans covering a total of approximately 3,192,064 acres of agricultural land in this state. There are in force at the present time considered as "live loans" 7,757 loans covering approximately 2,021,179 acres. Title to agricultural land has vested in the state at the present time by virtue of deeds upon foreclosure of rural credit loans to the extent of approximately 505,726 acres and rural credit loans are now in process of foreclosure covering approximately 164,468 acres.

It is, of course, impossible to compute the matter accurately or precisely from these figures. In the first place, the total tax levy in the state varies from year to year. Also the levy of 20.45

mills per dollar of valuation upon agricultural land is an average levy throughout the state, and while the state purpose levy therein contained is a uniform figure of 2.66 mills, yet the local purpose levy varies considerably, and in some local taxing districts the 1927 levy was appreciably above 20.45 mills per dollar of valuation on agricultural lands and in other taxing districts it was less. The figures given, however, do serve, we think, as a concrete demonstration of the financial magnitude of the issues involved as a result of the determination of the question presented in this case and for the purposes of such demonstration we may safely disregard the variations indicated.

According to the 1927 figures and taking the state-wide average levy there is involved at the present time at least an amount of approximately 64 cents per acre on a little over 500,000 acres of land throughout the state each year. If this land is subject to taxation as the circuit court has determined, then either the amount required to pay such tax must be added to the general state levy or there must be used for such payment the necessary amount of rural credit money which might otherwise be devoted to retiring rural credit bonds, which are a general state obligation. On the other hand, if the land is tax exempt, then to maintain the necessary tax income in the state an amount equivalent to 64 cents per acre on these 500,000 acres must be made up from other tax sources. Of course, assuming a general equality of the tax burden over the state as a whole, so far as concerns the contributions of the tax upon these lands to state purpose funds, which according to the 1927 experience was approximately 8 cents per acre, the question is acadamic rather than practical. If these lands continue to contribue 8 cents per acre to state purpose tax income, that amount must be raised for that purpose either by an equivalent increase in general state taxation or by using money which otherwise would decrease the state debt. If that contribution is not continued, then an amount equivalent to the 8 cents per acre must be made up by an increase to that extent in taxation over the state generally. In either case the taxpayers of the state must provide the money.

As to the 56 cents per acre, however, which according to the 1927 experience was the average contribution per acre of agricultural land to local taxing districts throughout the state, the situa-

tion is very different. If the foreclosed land be not exempt after it becomes state owned, then that 56 cents per acre going to local taxing districts wherein such land is situated must be paid by general state taxation. In other words, this burden will spread over the taxpayers of the state as a whole. On the other hand, if the land when state-owned is tax exempt, then the local district will lose that revenue and can replace it, if at all, only by increasing its demands upon the sources to which it may properly look for local tax purposes, and the burden to that extent will fall, not upon all taxpayers of the state as a whole, but solely upon the taxpayers of the local taxing districts wherein the foreclosed tracts may happen to lie. This, we think, fairly indicates the scope of the actual and immediate consequences which hinge upon the decision of this case.

But there is also necessarily involved in the decision of this case and in the determination of the grounds thereof a basic governmental question so far-reaching in its scope and implications that its importance entirely overshadows the immediate and financial consequences above pointed out. In the years 1917 and 1919, pursuant to constitutional amendments adopted at the November elections in 1916 and 1918, the people of this state to a very considerable extent entered the state as such in business enterprises previously engaged in by private capital exclusively. We have not only the rural credits structure, which has come to be vast and considerable, but the state has also received a mandate to undertake operations in various other important fields which have previously been generally considered, as a matter of governmental theory, if not of law, as the exclusive domain of private enterprise. Be it understood in this connection that we have neither approval nor criticism to offer but simply state the fact. As instances may be noted chapter 136, Laws 1919, whereby the state entered the business of mining, distributing, and selling coal; chapter 324, Laws 1919, whereby the state entered the business of manufacturing, distributing, and selling cement and cement products; chapter 244, Laws 1919, whereby the state entered the hail insurance business; and chapter 318, Laws 1919, whereby it entered the business of bonding the fidelity of public officers and employees.

The instant case presents to this court as a legal question, squarely and for the first time, the grave and extremely important and far-reaching question of the capacity in which the state of

South Dakota functions upon its entry, in competition with its citizens and others, into those fields wherein state operation is not essential to the perpetuation of government itself, nor necessarily incidental to the performance of functions which have previously been considered as generally accepted functions of government; the question whether in those new fields the state functions, as a matter of law, as what has been generally denominated a "sovereign state" with the attributes, privileges, and immunities hitherto generally conceived of as pertaining to sovereignty, or whether by entering those domains the state has put off sovereignty and functions in some different and lesser proprietary or quasi corporate capacity.

Two points of law were urged in the court below in advocating the result arrived at by the learned trial judge; First, that the land in question could not be tax exempt because the legal title of the state is a trust title only, for the benefit of third persons; and, second, that it could not be tax exempt because the state in acquiring and holding such title, and in fact in all its operations in the field of rural credit, is functioning not as a sovereign, but in a mere proprietary or quasi private corporate capacity. After thoughtful attention there have not occurred to us any other legal propositions which might logically be advocated as sufficient to sustain the judgment rendered, and it is therefore the two mentioned that will have our further consideration. The two matters were suggested by the learned trial judge in his memorandum opinion in the following language:

"It is my opinion that lands taken or acquired through foreclosure of rural credits mortgages do not belong to the state in its sovereign capacity, but the state simply holds the title in trust and that so long as there are outstanding claims for borrowed money against the trust fund, the state is not the owner of the land and the land is not exempt from taxation."

We will examine first the trust theory. It is undoubtedly true that a provision exempting state-owned property from taxation will not be held to exempt property to which the state holds mere legal title under circumstances such that the real beneficial interest is in third persons. Cooley on Taxation (4th Ed.) § 629, and cases cited; People ex rel Olmsted v. University of Illinois (1927) 328 Ill. 377, 159 N. E. 811; Comstock v. Boyle (1910) 144 Wis. 180, 128 N. W. 870; Wenner v. Mothersead (1928) 129 Okl. 273, 264 P. 817.

Section 19 of chapter 333, Laws 1917, the original Rural Credit Act, now section · 10167, Rev. Code 1919, with a slight change in phraseology, not here material, by virtue of section 23, c. 187, Laws 1927, provided as follows:

"Mortgages, promissory notes and other evidences of indebtedness and title to real or other property acquired by such board shall be held in trust for the payment of money borrowed by this state for the purpose of establishing and maintaining such system of rural credits, and shall never be diverted to any other purpose; provided, that such board may invest and reinvest the proceeds of the same in first mortgage loans, as provided by this chapter, when not required for the immediate payment of warrants or bonds, or interest on bonds."

It is true that this section of our law provides by its words that property acquired by the rural credit board "shall be held in trust for the payment of money borrowed." We seriously doubt whether those words in the statute, without more, are in fact sufficient actually to create any real trust relation between the state of South Dakota and the holders of rural credit bonds, or to require the state in any strict sense to hold foreclosed land in trust for the payment of such bonds. That question, however, need not be decided in this case and we specifically refrain from deciding it. If there be a trust relationship, it is by no means such a case as is contemplated or considered in the authorities above cited, where legal title is held in trust exclusively for the benefit of third persons. If there is here any trust, the trust purpose is to apply the real estate or the proceeds thereof upon a debt due and owing from the trustee to the beneficiary. Rural credit bonds are a general obligation of the state. If a tract of foreclosed land, or the proceeds thereof, is applied in payment of rural credit bonds, the bondholder is benefited in the sense that he receives money due him by virtue of his bond contract; but the state is equally benefited in the sense that its outstanding general faith and credit obligations are pro tanto reduced. We are therefore of the opinion that, even upon the assumption that the title of the state to the real estate in question is a trust title to enable said real estate or the proceeds thereof to be applied in payment of rural credit bonds, the performance of such trust would benefit the trustee equally with the beneficiary, and the trust would not be of such a nature as in and

of itself to prevent the property from being tax exempt as state-owned property within the provisions of section 10168, Rev. Code 1919, and section 5, art. 11, Constitution of South Dakota. We think, therefore, that the decision of the trial court cannot be sustained upon this trust theory.

We turn now to the much more important and difficult question of whether or not the state holds the title to the realty here involved in its sovereign capacity. The reasoning here is, with reference to the constitutional provision exempting property of the state from taxation, that the language of that provision must be interpreted in the light of common understanding at the time of its adoption. As recently stated (Commonwealth v. Dabbierio [1927] 290 Pa. 174, 138 A. 679):

"The language of the Constitution is to be interpreted in its popular sense, as the common people who adopted it, and made it their charter of government, must have naturally understood it when they voted on it."

It is argued that when our Constitution was adopted the state owned no property excepting such as it held in its clearly sovereign capacity and in connection with the performance of essential governmental functions, and that it was not within the contemplation of the framers of the Constitution, or of the people at that time, that the state would ever engage in business then considered private, or would hold or own property in a nonsovereign or proprietary or quasi coroporate capacity, and that, therefore, the constitutional exemption then enacted will not be held to include property now acquired and held by the state in a capacity and in the performance of functions entirely beyond any contemplation at the time of the adoption of the Constitution.

This is in substance the view taken by the Supreme Court of the United States when the state of South Carolina established state dispensaries for the wholesaling and retailing of liquor. The Supreme Court refused to apply to the state agencies employed in that particular function of the state the general and well-established doctrine of state exemption from federal taxation, and the court said:

"There is something of a conflict between the full power of the Nation in respect to taxation and the exemption of the State from Federal taxation in respect to its property and a discharge of

all its functions. Where and how shall the line between them be drawn? We have seen that the full power of collecting license taxes is in terms granted to the National Government with only the limitations of uniformity and the public benefit. The exemption of the State's property and its functions from Federal taxation is implied from the dual character of our Federal system and the necessity of preserving the State in all its efficiency. In order to determine to what extent that implication will go we must turn to the condition of things at the time the Constitution was framed. What, in the light of that condition, did the framers of the convention intend should be exempt? Certain it is that modern notions as to the extent to which the functions of a state may be carried had then no hold. Whatever Utopian theories may have been presented by any writers were regarded as mere creations of fancy, and had no practical recognition. * * * While many believed that the liberty of the people depended on the preservation of the rights of the states, they had no thought that those states would extend their functions beyond their then recognized scope, or so as to imperil the life of the Nation. As well said by Chief Justice Nott, delivering the opinion of the Court of Claims in this case (39 Ct. Cl. 284):

"'Moreover, at the time of the adoption of the Constitution there probably was not one person in the country who seriously contemplated the possibility of government, whether State or National, ever descending from its primitive plant of a body politic to take up the work of the individual or body corporate. The public suspicion associated government with patents of nobility, with an established church, with standing armies, and distrusted all governments. Even in the high intelligence of the convention there were men who trembled at the power given to the President, who trembled at the power which the Senate might usurp, who feared that the life tenure of the judiciary might imperil the liberties of the people. Certain it is that if the possibility of a government usurping the ordinary business of individuals, driving them out of the market, and maintaining place and power by means of what would have been called, in the heated invective of the time, "a legion of mercenaries," had been in the public mind, the Constitution would not have been adopted, or an inhibition of such power would have been placed among Madison's Amendments.'

"Looking, therefore, at the Constitution in the light of the conditions surrounding at the time of its adoption, it is obvious that the framers in granting full power over license taxes to the National Government meant that that power should be complete, and never thought that the states by extending their functions could practically destroy it.

"If we look upon the Constitution in the light of the common law we are led to the same conclusion. All the avenues of trade were open to the individual. The Government did not attempt to exclude him from any. Whatever restraints were put upon him were mere police regulations to control his conduct in the business and not to exclude him therefrom. The Government was no competitor nor did it assume to carry on any business which ordinarily is carried on by individuals. Indeed, every attempt at monopoly was odious in the eyes of the common law, and it mattered not how that monopoly arose, whether from grant of the sovereign or otherwise. The framers of the Constitution were not anticipating that a state would attempt to monopolize any business heretofore carried on by individuals. * * *

"These decisions, while not controlling the question before us, indicate that the thought has been that the exemption of state agencies and instrumentalities from National taxation is limited to those which are of a strictly governmental character, and does not extend to those which are used by the state in the carrying on of an ordinary private business." South Carolina v. United States (1905) 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737.

See, also, Flint v. Stone Tracy Co. (1910) 220 U. S. 108, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.

With reference to the legislative attempt to exempt from taxation "all real estate and other property taken by said board," the argument is that in the rural credit field the state of South Dakota acts in a nonsovereign or private proprietary capacity, and that it is just as improper and impossible for the Legislature to grant to the state in such quasi private corporate capacity a special or exclusive privilege or immunity as it would be to grant the same to any other private business corporation (Constitution, art. 3, § 23), and that the Legislature cannot grant to the state in the farm mortgage business any special immunity from taxation any more than

it could grant such immunity to a private corporation engaged in the farm mortgage business. The theory underlying this view, and from which it is deduced, has found frequent expression by courts, and is fairly exemplified by the language of the Massachusetts court in Boston Molasses Co. v. Commonwealth (1907) 193 Mass. 387, 79 N. E. 827, as follows:

"And it must be remembered that in giving this lease the commonwealth was not acting in its political character as sovereign, but merely as the owner of property, about which it was making a contract. As to this contract it put itself into the position of a private citizen, and the lease must be construed as if it were made between two individuals. Com. v. Andre, 3 Pick. 224, 225. Having chosen to descend from the plane of its sovereignty and to make this contract with a private person, it is to be regarded as itself a private person, and is bound as such. Hall v. Wisconsin, 103 U. S. 5, 11, 26 L. Ed. 302. As was said in People v. Stephens, 71 N. Y. 527, 549, 'The state, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other. There is not one law for the sovereign and another for the subject; but when the sovereign engages in business and the conduct of business enterprises, and contracts with individuals, although an action may not lie against the sovereign for a breach of the contract, whenever the contract in any form comes before the courts, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged in the contractor, dealer and suitor.' "

This court in its previous decisions has appeared to recognize some sort of legally existent but undefined distinction between the state of South Dakota in a sovereign and nonsovereign capacity. In Stavig v. Van Camp (1923) 46 S. D. 472, 193 N. W. 731, this court said:

"In carrying out the hail insurance law the state is not acting in its sovereign capacity, but is engaged in the business of hail insurance."

And in Hughes County v. Henry (1925) 48 S. D. 98, 202 N. W. 286, while this court in the majority opinion did not under-

take to decide in what capacity the state engaged in rural credit operations, yet the court did squarely point to the actual existence of a legal distinction between the state in a private capacity and the state in a sovereign or governmental capacity in the following language:

"The question as to whether by its rural credit operations the state is engaged in its private or business capacity as distinguished from its sovereign or governmental capacity, is a serious one, but the disposition we have made of the case renders unnecessary the consideration of that question."

We therefore come face to face at this point with the question of sovereignty. It is, in the phrase of Prof. McBain (Living Constitution [New York, 1927], p. 8), "at best a most obstreperous and baffling word." The conception of sovereignty early arose in the minds of political thinkers and students of the nature of government in search of an ultimate abiding place for supreme authority in the state. The nature of sovereignty, as we understand the concept in modern times, was probably first systematically discussed by Jean Bodin, the French political philosopher in his De Republica (1586). Since that time the conception and its meaning have been perpetually argued and discussed by philosophers, political scientists, students of jurisprudence and government, and unfortunately by lawyers and judges. The term and the concept have meant all things to all men, and the word itself has become so blurred by varied usage that today it is almost meaningless unless the user accompanies it by a precise definition of what he intends to signify.

The history and theory of the doctrine of sovereignty from the viewpoint of the governmental theorist have been much written about, despite the fact that hardly any two writers or thinkers have seemed to agree as to just what sovereignty is or just where it is located or how it is recognized and discovered. The following works, among others, deal adequately with the origin and history of the doctrine and its present status as a concept in the field of theory: Bryce, Studies in History and Jurisprudence (New York, 1901) pp. 503-555; C. E. Merriam, History of the Theory of Sovereignty Since Rousseau (New York, 1900) ; Gettell, History of Political Thought (New York, 1924) ; Willoughby, The Fundamental Concepts of Public Law (New York, 1924), particularly page 72 et seq.; Dicey, Law of the Constitution (8th Ed. Reprint, London,

1926) ; Maine, Early History of Institutions (New York, 1888) p. 342 et seq.; Merriam and others, Political Theories Recent Times (New York, 1924) p. 80 et seq.; Dunning, Political Theories Rousseau to Spencer (New York, 1926) ; Laski, The Problem of Sovereignty (New Haven, 1924) ; Ward, Sovereignty a Contemporary Political Notion (London, 1928) ; Holdsworth, Some Lessons From Our Legal History. (New York, 1928).

Originally employed as the description of a concept in the minds of political theorists, the word "sovereignty" promptly crossed the border line into the field of law and it has pervaded the reports with much frequency and has been a matter of perplexity and a source of confusion from the earliest days. Less than five years after the final ratification of the Constitution of the United States we find the Supreme Court discussing "sovereignty" and Mr. Justice Wilson saying:

"Who, or what, is sovereignty? What is his or its sovereignty? On this subject, the errors and the mazes are endless and inexplicable." Chisholm v. Georgia (1793) 2 Dall. 419, 1 L. Ed. 440.

And we may note also in this connection the early leading case of McCulloch v. Maryland (1819) 4 Wheat. 316, 4 L. Ed. 579, wherein Mr. Chief Justice Marshall discusses at length the nature of federal and state sovereignty. The word has since been employed in an infinite number of decisions in varying connections and with utterly varying meanings, so that it may almost be said that its use today serves to conceal rather than to transmit ideas. To cite here the considerable number of cases that we have examined dealing with the matter of sovereignty and to endeavor here to set out their points of difference and agreement and the various conceptions that have been sought to be expressed by the use of the term would be a futile and almost interminable task. Different courts have taken different views at different times. The courts have seemed frequently to confuse "sovereignty" as a concept of the philosophic student of government with "sovereignty" in the much more limited sense in which, and in which only, we as lawyers and judges have the right to concern ourselves with it. The important thing that we must bear in mind, we think, is this: That whatever "sovereignty" may have meant or may mean now to the moralist, or the philosopher, or the student of jurisprudence,

or the political scientist, or the theorist in the field of government, for us as lawyers and judges, under our constitutional form of government, the conception is definite and limited. In the words of Lord Bryce (Studies in History and Jurisprudence, p. 505) :

"For the purposes of the lawyer a more definite conception is required. The sovereign authority is to him the person (or body) to whose directions the law attributes legal force, the person in whom resides as of right the ultimate power either of laying down general rules or of issuing isolated rules or commands, whose authority is that of the law itself. It is in this sense, and in this sense only, that the jurist is concerned with the question who is sovereign in a given community."

Or as stated by Prof. Chafee (32 Har. Law, Rev. 981) :

"In our professional capacity as judges and practitioners we must acknowledge the men chosen under the Constitution as the supreme rulers of the land and assert that the Constitution is changed solely through the methods provided by its own terms."

See, also, Dicey, Law of the Constitution, p. 70 et seq.; Willoughby, Nature of the State, pp. 205 et seq. and 276 et seq.

■ The proposition then narrows down to this: For us as lawyers and judges "sovereignty" in the only sense with which we can be concerned, that is, in the meaning of ultimate legal source of authority, in the state of South Dakota rests in the people of the state and finds its expression in the expression of the popular will in the modes provided by law, and the only restriction thereon under our scheme of government is the Constitution of the United States. Generally speaking, the will of the people as to the promulgation of law is expressed by the Legislature, and the power of the Legislature to express the omnicompetent will of the people is subject to certain restrictions placed thereon by the people in the Constitution of this state, but otherwise it is plenary. "There are no limitations upon the legislative powers of the Legislature in this state, except such as are imposed by the state and federal Constitutions." Peterson Oil Co. v. Frary (1923) 46 S. D. 258, 192 N. W. 366, and cases cited.

The will of the people was directly expressed without passing through the medium of a Legislature when the Constitution was adopted and has since been directly expressed and may be again by constitutional amendment. When the will of the people is ex-

pressed through the agency of the Legislature, the courts, upon proper occasion, will determine whether the Legislature has overstepped any of the restrictions laid upon its otherwise plenary powers by the Constitution; but as to the direct expression of the will of the people by the Constitution or amendments thereof, the only conceivable limitation under our form of government is a conflict with the Federal Constitution. The government of this state has its origin in the people of this state, and what the people of this state say it shall be it may be and must be, as a matter of law (always within the limits of the Federal Constitution), and the functions of government in the state of South Dakota (always within the limits of the Federal Constitution) are what the people of the state of South Dakota say they shall be. One of the restrictions which the people by their direct mandate placed upon their general legislative agency was that "Taxes * * * shall be levied and collected for public purposes only." Const. S. D., § 2, art. 11. Therefore, when the Legislature seeks to endow the state (or even a municipality) with some new function, it is for the courts to say, upon proper application, whether such new function is a proper governmental function; i. e., whether it constitutes a "public purpose" within the purview of the constitutional restriction. See White Eagle Oil Co. v. Gunderson (1925) 48 S. D. 608, 205 N. W. 614, 43 A. L. R. 397. But when the people speak by their direct voice by way of constitutional amendment (as they did regarding rural credits by the 1916 and 1918 amendments to section 1 of article 13), there is no longer any question of "public purpose" for our interpretation. If the people of this state by their direct voice declare that X is a public purpose ( i. e., a proper governmental function for this state), then legally speaking, regardless of previous custom, or economic wisdom, or expediency, or sound theory of government, so far as this court is concerned X must be held to be a proper governmental function, and the only conceivable limitation upon the nature of X, as a matter of law, is a possible conflict with the Federal Constitution. As to this last point, it may here be noted that the federal courts have not indicated any disposition to interfere with the several states in this regard; but the tendency of their decisions has been in general to leave to the several states the determination of proper state governmental functions and to display a manifest, and doubtless proper, reluctance to hold

such determination in conflict with the Federal Constitution. See Jones v. City of Portland (1917) 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660; Scott v. Frazier, D. C. 1919, 258 F. 669; Green v. Frazier (1920) 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878.

It is entirely apparent that what are public purposes, or, in other words, what are proper governmental functions under our system of government, is a question to be determined in this state, as a matter of law, by the will of the people whenever that will is expressed, subject only to the Federal Constitution, and it is a commonplace today that the scope of governmental function is being constantly enlarged.

"Now that the state has withdrawn from the control of religion, now that it has in general begun to refrain from acting as the arbiter of moral issues, the crucial question of politics concerns its relation to the economic order. * * *

"Political power is formally superior. It can formally decree the conditions and limits of economic power. If other methods fail, it can take over the reins of direct control or even 'nationalize' any part of the economic structure. * * *

"The state cannot abandon the economic field, because within it some forms of universal regulation, such as only law can secure, are desirable and even necessary. * * * Nearly every one would admit that certain economic services of a universal character are best monopolized by the state or its subdivisions such as county or municipality. We might instance the postal service or the water supply. The lines we draw must be determined by considerations of competence, not by a sheer demarcation of interests. * * *

"The range of state action is not to be defined by any eternal criterion. It must vary with the conditions, with the need for it and with its own capacity. * * *

"The great internal struggles of the modern state have centered round just this question, what the extent and character of its control of, or participation in, the economic order should be, and out of these struggles have come its chief developments in recent times." MacIver, The Modern State (Oxford, 1926) pp. 291-298.

See, also, In re Opinion of the Judges, 38 S. D. 635, 162 N. W. 536, at page 642 of the state report; Wambaugh, The Present Scope of Government, 20 American Bar Association Reports,

307; Kneier, Municipal Functions and the Law of Public Purpose, 76 Univ. Pa. Law Rev. 824.

With the advisability from the point of view of sound governmental theory of engaging state government in these extended fields, we, as judges, have neither right nor power to concern ourselves. The analytical jurist or the student of government or the political scientist may classify as much as he will the various functions with which the people of this state have said from time to time that the government of this state shall be endowed. He may divide them, as Prof. Wambaugh does (cited supra) into "primary, incidental and enlarged," or he may christen them, as others have done, "essential and nonessential." For us as judges the only question is this: Is there some sort of actual, legal difference, not as a matter of governmental theory, but as a matter of law, inherent in the nature of our institutions, in the capacity in which the government of this state functions in the performance of the various acts which the people of this state in their omnicompetence have determined to be proper for governmental functioning? In other words, does the government of this state in performing the functions devolved upon it by the will of the people of this state function sometimes as a sovereign government and sometimes as a nonsovereign government, as a necessary matter of law? Or, to phrase the problem without employing the perplexing and confusing word "sovereign," we may put it this way: Is there inherent in the nature of things, legally speaking, some necessary kind of distinction in the capacity of government functioning in some of the fields in which it has been placed by the will of the people as distinguished from other such fields? Is there an existent legal distinction applicable to the various functionings of the government of this state, analogous to the distinction which the decisions have erected with reference to the governmental and administrative functions of a municipality; or analogous to the distinction recognized in the French law between "acts of public power" (puissance publique) and "acts of administration" (actes de gestion); or analogous to the distinction taken in other Continental countries by the concept of the "fiscus" whereby in substance the state in its functions of business enterprise is treated by the courts as occupying a position very similar to that of a private corporation so engaged? To put it concretely, the maintenance of state charitable

and penal institutions was recognized as a proper governmental function in this state at the time of the adoption of the Constitution and was therein specified as such by the direct voice of the people. Since that time the people, by that same direct voice, have said that various other matters were proper public purposes and governmental functions, including the operation of rural credits, hail insurance, coal mining, cement manufacture, etc. Must we as judges say, or can we say, that the state in performing these functions latterly intrusted to it operates, legally speaking, in a capacity which the eyes of the law will view as necessarily different from that in which the state operates in its other and older functions. Without undertaking to cite or analyze any considerable number of the various cases we have examined (and while, of course, we cannot claim, and do not feel, that our investigation of this somewhat complicated question has been by any means exhaustive, yet we believe it has been reasonably extensive and thorough), we state it to be our conclusion and opinion that this question must be answered in the negative. Any other view would only make for uncertainty and confusion. No satisfactory line of demarcation is observable, and in the implications from what appear to us to be the better reasoned authorities we are not able to find support for such a distinction as applicable to a state government under our institutions. In the words of appellant's brief in this case, we think that, legally speaking, "the state is the state." Its functions are what the people of the state (always within the limits of the Federal Constitution) say they shall be. The fact that the people of this state may from time to time see fit to endow the government of the state with functions which it did not previously have, or with functions which hitherto may generally have been left to private enterprise rather tha nto governments, does not, legally speaking, affect the character or capacity in which the government acts in performing those functions when in fact they are devolved upon the state government by the people.

"The appellant seeks to confine this rule of nonliability for torts to cases where the negligence of the officer or agent occurred in the discharge of some purely governmental function of the state. He contends that, in leasing the armory, the state was engaged in a private enterprise, and that the rule of nonliability, therefore, does not apply.

The question is admittedly a new one. No authority distinctly so holding, nor indeed recognizing such an exception, has been cited, and we have found none. It is argued that the distinction is sustained by analogy to a similar exception to the rule of nonliability as applied to municipal corporations. The analogy, however, does not hold. Municipal corporations enjoy their immunity from liability for torts only in so far as they partake of the state's immunity, and only in the exercise of those governmental powers and duties imposed upon them as representing the state. In the exercise of those administrative powers conferred upon, or permitted to, them solely for their own benefit in their corporate capacity, whether performed for gain or not, and whether of the nature of a business enterprise or not, they are neither sovereign nor immune. They are only sovereign and only immune in so far as they represent the state. They have no sovereignty of their own, they are in no sense sovereign per se. Their immunity, like their sovereignty, is in a sense borrowed, and the one is commensurate with the other. Such is, in effect, the conclusion reached in Hill v. Boston, 122 Mass. 344, 23 Am. Rep. 332, after a most exhaustive review of the authorities, both American and English. The same principle underlies our own decisions. * * *

"On the other hand, the state is inherently sovereign at all times and in every capacity. It is the organized embodiment of the sovereign power of the whole people. By reason of this sovereignty, it possesses all powers, but only such powers, as are within the limitations of the state Constitution and without the prohibitions of the Federal Constitution. It can do no act except in the exercise of this sovereign power and within these constitutional limitations. If it may constitutionally take over any enterprise, though usually of the nature of a private business, the very taking over is an exercise of this sovereign power. It seems much more logical and much more consonant with the idea and genius of sovereignty that the enterprise thus taken over should be impressed with the sovereign character of the state than that the state should become hampered by the private character of the enterprise. The latter result is incompatible with the concept of sovereignty." Riddoch v. State (1912) 68 Wash. 329, 123 P. 450, 42 L. R. A. (N. S.) 251, Ann. Cas. 1913E, 1033 (omitting citations).

"To overcome the application of the rule, plaintiff in error

argues that in the operation and maintenance of the railroad the United States is carrying on a commercial business, and in such business has, to an extent, abandoned its sovereign capacity. We cannot uphold that view. Congress, in its power to regulate commerce, could construct, or could authorize a corporation or individuals to construct, a railroad, or to buy a railroad, and clearly, in the territories, has a plenary power to grant franchises, to create a railroad system, and to employ the agency of a corporation as a means of accomplishing such object. California v. Central P. R. Co., 127 U. S. 1, 39, 32 L. Ed. 150, 157, 2 Inters. Com. Rep. 153, 8 S. Ct. 1073. In Luxton v. North River Bridge Co., 153 U. S. 525, 38 L. Ed. 808, 14 S. Ct. 891, the court held that Congress could create corporations as appropriate means of executing the powers of government, as, for instance, a railroad corporation, for the purpose of promoting commerce among the states. Indiana v. United States, 148 U. S. 148, 37 L. Ed. 401, 13 S. Ct. 564. The Act of March 12, 1914, chap. 37 [48 USCA § 301 et seq.], heretofore cited, which authorizes the President to locate, construct, and operate railroads in Alaska, expressly provides that the Alaska railroad is for the settlement of public lands and for transportation of coal for the Army and Navy, for the transportation of troops, arms, munitions of war, the mails, and for other governmentals and public uses,' and to transport passengers and property. The act (§ 4) also confers authority upon the President, through such agents as he may appoint or employ, to do all necessary acts, in addition to those specially authorized, to enable him to accomplish the purposes of the act. By § 1 the President is authorized to purchase or acquire other railroads to carry out the purposes of the act, and to employ officers and agents in order to accomplish the purpose of the legislation. Taking all these provisions together, they plainly show that the United States, in acquiring the stocks and bonds and property of the Alaska Northern Railway Company, acted in its sovereign capacity, and, in exercising entire control, possession, ownership, and management, has merely employed the corporate organization as an agency through which to execute the purposes of the statute." Ballaine v. Alaska, etc., Ry. Co. (C. C. A. 1919) 259 F. 183, 8 A. L. R. 990.

"The Pesaro was necessarily employed in the pursuit of public purposes or national objects; just as is any of the merchant vessels owned and operated as such by the United States. National ob-

jects embrace many ends other than those of war and peace. To promote the general welfare is universally regarded as a national object, and is specifically mentioned in the preamble of the Constitution as one of the six great national aims that the founders saw in drafting that instrument. Cf. Vattel, Bk. I, §§ 86, 87. The national character of the objects that a public, government-owned, merchant marine is calculated to procure was recognized by Congress in enacting the law providing therefor, as those objects are set forth in the preamble of that Act. Title Guarantee & Trust Co. v. Crane Co., 219 U. S. 24 [31 S. Ct. 140, 55 L. Ed. 72]; United States v. Ansonia Brass Co., 218 U. S. 452 [31 S. Ct. 49, 54 L. Ed. 1107]; Tucker v. Alexandroff, 183 U. S. 424 [22 S. Ct. 195, 46 L. Ed. 264]. Those cases distinguishing between the public and private activities of municipalities are not here in point. A real sovereign, a state, a nation, is always sovereign. In none of its activities is it ever subject to a higher human will, individual or collective." Berizzi Bros. Co. v. Steamship Pesaro (1926) 271 U. S. 562, 46 S. Ct. 611, 70 L. Ed. 1088. Cf. The Pesaro (D. C. 1921) 277 F. 473, and The Pesaro (1926, D. C.) 13 F. (2d) 468.

See, also, Murray v. Wilson Distilling Co. (1908) 213 U. S. 151, 29 S. Ct. 458, 53 L. Ed. 742; Oliver American Trading Co. v. Government of United States of Mexico (1924, C. C. A.) 5 F. (2d) 659 (application for certiorari denied, 267 U. S. 596, 45 S. Ct. 352, 69 L. Ed. 805); Paulus v. State (1924) 52 N. D. 84, 201 N. W. 867; Rauschan v. Gilbert (1927) 80 Cal. App. 754, 253 P. 173; U. S. Shipping Board Emergency Fleet Corp. v. Western Union Telegraph Co. (1928) 275 U. S. 415, 48 S. Ct. 198, 72 L. Ed. 345.

We are, therefore, of the opinion that the people of this state may give to the government of this state such powers as they see fit, always within the limits of the Federal Constitution. The purpose and the sole purpose of government in this state, in its actual operation, is to carry out the powers and perform the functions intrusted to it by the people of this state, and there is not, legally speaking, any distinction in the capacity in which the government of the state acts, or in the essential nature of its operation as a matter of law, in the performance of any one function intrusted to it by the people as compared with the performance of other functions so intrusted. We therefore hold that there cannot be

successfully maintained, as a matter of law, in this state, under the circumstances here involved, a distinction between what has been frequently denominated as a "sovereign" and "nonsovereign" capacity of the state, and in so far as we indicated otherwise in Stavig v. Van Camp, supra, and Hughes County v. Henry, supra, we now entertain the view that we were then ill-advised.

It follows that there is no constitutional reason arising out of the nature of the capacity in which the state functions in its rural credit operations which would render invalid the legislative declaration (section 10168, Rev. Code 1919) that all property acquired in such operations shall be tax exempt. Whether such tax exemption results, in its actual operation, in placing upon the taxpayers of local taxing districts where foreclosed rural credit land is located an unfair and disproportionate share of the burden arising from the activities of the state in the rural credit field, we do not undertake to say. But if it does, and if such burden is one which ought, in fairness and equity, to be borne by the taxpayers of the entire state generally, nevertheless that is not a matter which this court can change by any judicial interpretation in the present state of our law.

We hold, therefore, that the learned trial judge erred in his determination that the tract of land in controversy was not exempt from assessment and taxation after title thereto vested in the state of South Dakota by deed issued pursuant to the foreclosure of the rural credit mortgage, and the judgment and order appealed from are reversed, and the cause remanded, and inasmuch as the facts are not at all in dispute and a new trial could serve no purpose whatever, the trial court is directed to strike out the eighth finding of fact (it being really in the nature of a conclusion of law, though denominated a "finding"), which reads as follows:

"That the title to said real estate above described is held in trust by the State of South Dakota for the payment of money evidenced by said bonds borrowed by the State of South Dakota for the purpose of establishing and maintaining its said Rural Credit Department."

And having stricken such finding, the trial court is directed to modify the conclusions of law in accordance with the views indicated in this opinion (the remaining findings being sufficient support therefor) and thereupon to enter judgment in favor of plaintiff-appellant. No costs will be taxed upon this appeal.

BURCH, P. J., and BROWN, J., concur.

· POLLEY, J. (concurring specially). The property involved in this action belongs to the state. Under the provisions of section 5 of article II of our Constitution, "the property of the United States and of the state, county and municipal corporations, both real and personal, shall be exempt from taxation."

This provision is too plain to call for interpretation by the court, or to admit of any doubt of its meaning; but to make sure that no such question should ever arise, the Legislature, by section 10168 (Rev. Code) provided that:

"All mortgages, real and other property taken by such board [Rural Credits] in its business of loaning * * * shall be free from all general taxes, state, county and municipal, and shall not be subject to state income tax."

Because of these constitutional and statutory provisions the property involved is exempt from taxation, and the judgment and order appealed from should be reversed, and judgment directed for plaintiff.

SHERWOOD, J. (concurring specially). I concur in the result reached by the majority of the court, but in my view the provisions of section 5, art. 11, of our Constitution is decisive of this case. This section provides: "The property of the United States and of the state, county and municipal corporations, both real and personal, shall be exempt from taxation."

It is elementary that, "if the meaning of the Constitution itself is plain, it is neither necessary nor permissible to resort to extrinsic matters for its construction." 12 C. J. 62.

I think the terms of this constitutional provision are too plain to call for or permit of any interpretation by the court. This view receives support from the following provision in the law establishing rural credits, now section 10168, R. C. 1919, which reads as follows: "All mortgages, real and other property taken by such board [Rural Credits] in its business of loaning * * * shall be free from all general taxes, state, county and municipal, and shall not be subject to state income tax."

It follows that the discussion and definition of the word "sovereignty" is not necessarily involved in this case. When it is defined and interpreted in its relation to our form of government, it

will have to be considered with relation to the entire Constitution and with reference to the general scope and purpose of that instrument.

The Federal Constitution provides: "The United States shall guarantee to every state in this Union a republican form of government." Fed. Constitution, art 4, § 4.

Each state when it was admitted into the Union adopted this provision and became a party to this guaranty. Whether the several states acting individually may abrogate what they guarantee collectively to enforce is not involved in this case and should not be prejudiced by this decision. I do not concede that there is no distinction between sovereign and nonsovereign capacities of the state, nor that the words referring thereto in Stavig v. Van Camp and Hughes County v. Henry were ill-advised.