**L.R. FOY CONSTRUCTION CO., INC., a Kansas Corporation with its principal place of business in Hutchinson, Kansas, and Spearfish Ready-Mix, Inc., a South Dakota Corporation with its principal place of business in Spearfish, South Dakota, individually and as representative of that class of persons similarly situate, Plaintiffs and Appellants**

v.

**SOUTH DAKOTA STATE CEMENT PLANT COMMISSION, the principal place of business of which is in Pennington County, South Dakota, and William P. Scanlon, of Rapid City, Pennington County, South Dakota, Defendants and Appellees.**

**No. 15000.**

Supreme Court of South Dakota.

Argued Jan. 14, 1986.

Decided Jan. 14, 1987.

Ronald G. Schmidt, Schmidt, Schroyer, Colwill, Zinter & Barnett, Pierre, Wayne F. Gilbert, Banks & Johnson, Rapid City, for plaintiffs and appellants.

Brent Wilbur, May, Adam, Gerdes & Thompson, Pierre, for defendants and appellees.

HERTZ, Acting Justice.

Plaintiffs Foy Construction Company and Spearfish Ready-Mix (Foy/Ready-Mix), appeal the trial court's order granting a motion to dismiss in favor of appellee South Dakota Cement Plant Commission (Cement Plant). We reverse and remand for trial.

This action was commenced in July of 1984. The trial court dismissed Foy/Ready-Mix's claims based solely upon

the U.C.C. four year statute of limitations for breach of contract. (SDCL 57A–2–725(1) and (2)). The trial court also held that the Cement Plant is immune from suit for Foy/Ready-Mix's tort claims, namely, fraud and deceit, negligent misrepresentation, and tortious interference with contract, under the doctrine of sovereign immunity.

Ready-Mix and Cement Plant had an annual requirements contract for several years prior to 1978. Cement Plant had previously met all of Ready-Mix's cement requirements for each of the several years preceding 1978. The parties had an established record of commercial dealing consonant with the practices of the trade and industry. Ready-Mix, a dealer for Cement Plant, relies solely upon Cement Plant for cement to batch concrete for its customers. In 1978, Foy, a customer of Ready-Mix, was awarded the contract to construct a new high school in Spearfish, South Dakota.

As was customary, Cement Plant met with Ready-Mix in January of 1978 to determine their cement requirements for the year. Cement Plant agreed to deliver, and Ready-Mix agreed to pay for cement to meet Ready-Mix's substantially increased cement requirements for 1978. Cement Plant knew in January of 1978 that Ready-Mix was committed to furnishing concrete to Foy for the new high school project in Spearfish. Moreover, Cement Plant assured Ready-Mix there would be cement available for its general and special requirements in 1978. Ready-Mix, in reliance on Cement Plant's promises, acquired new equipment at a cost of some $80,000. Cement Plant knew in January, 1978, that general demand for cement would be substantially higher in 1978 than the previous year.

In 1974, the Cement Plant had commenced a substantial construction project for the enlargement of its manufacturing facilities. The new kiln essential to meeting 1978 cement delivery requirements was not on line, even though there had been numerous deadlines established in November and December, 1977, and again in January, February, March, April and May of 1978. Cement Plant knew the new kiln would be substantially unavailable for 1978 production. Even so, Cement Plant continued to make representations and assurances to their dealers, including Ready-Mix, that the cement for their requirements would be available during 1978. Furthermore, in spite of the failure to get the new kiln in operation, Cement Plant sought and contracted with new customers.

In January 1978, Cement Plant reaffirmed its policy of supplying all of its South Dakota customers first and to honor all of its contractual commitments. At the same time, Cement Plant admitted to having a serious cement shortage and gave as reasons therefor the dramatic increase in cement usage in the regular marketing area; a shortage of supply from other suppliers; and the inability of placing the new kiln on line as originally planned.

On March 28, 1978, Ready-Mix and Cement Plant again discussed the general and special cement requirements, including the Spearfish High School project. Cement Plant at this time again represented the cement would be available at a guaranteed price.

On April 11, 1978, Ready-Mix entered into a formal contract for sale of cement for the Spearfish School project with Foy. Thereafter, Cement Plant commenced delivery of some cement to Ready-Mix.

Cement Plant breached their contract of timely delivery of cement to Ready-Mix in July of 1978. Neither Ready-Mix nor Foy were ever given notice from Cement Plant that cement would not be delivered or that there would be a delay in delivery.

In February 1978, Cement Plant purchased a new cement terminal and sales facility in Denver, Colorado, and immediately began soliciting new customers. In March 1978, Cement Plant agreed to furnish cement for the Stapleton Airport project in Denver. On June 6, 1978, Cement Plant entered into a contract with Eisenhower Construction Company, Inc., for 85,000 tons of cement for the airport

project (new customer). Cement Plant actually delivered 86,912 tons of cement in Colorado in 1978. On June 26, 1978, Cement Plant made Eisenhower their number one priority with preference over all existing customers. Cement Plant, experiencing a shortage of their own cement, made various purchases from the Medusa Cement Company of Ohio, totaling some 65,-000 tons. On June 29, 1978, Cement Plant agreed to ship Eisenhower a pound of cement for every pound of cement which Cement Plant could have delivered from Medusa. Cement Plant knew in June of 1978 that Medusa was not shipping cement as contemplated.

In July and August of 1978, Cement Plant, pursuant to SDCL 57A–2–615, adopted certain cement allocations. Foy/Ready-Mix, unaware of the new customers taken on by Cement Plant, assumed these allocations were fair and reasonable and made in good faith. At about this same time, Cement Plant, again without any knowledge on the part of Foy/Ready-Mix, was effecting settlements with certain of its customers.

It wasn't until May of 1984 that Foy/Ready-Mix learned that Cement Plant willfully and knowingly oversold its 1978 production capacity; that despite its promises to the contrary, Cement Plant gave preferential treatment to new, out-of-state customers while breaching its delivery contracts to existing South Dakota customers; that Cement Plant misrepresented the amount of cement purchased at a loss to fulfill its pending obligations; and that Cement Plant fraudulently concealed the settlements it made with selected customers. Upon discovery of these facts, Foy/Ready-Mix commenced this action in July of 1984.

Cement Plant argued and the trial court agreed, that SDCL 57A–2–725(2) is the applicable statute of limitations which governs Foy/Ready-Mix's four causes of action. SDCL 57A–2–725(2) states, "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." The trial court found that the breach of the contract cause of action occurred in July of 1978. The lawsuit was filed on July 12, 1984, and the four year statute of limitations had run its course, irrespective of Foy/Ready-Mix's knowledge of the breach and therefore, the trial court concluded the breach of sales contract must be dismissed.

Further, the trial court determined that the three remaining tort claims are not independent causes of action, since they arise out of the contract cause of action, and cannot, therefore, exist without the contract cause of action. The trial court concluded the four year statute of limitations thus applied to the tort claims and granted dismissal of these actions as well. The court further held that in any case, the tort claims must be dismissed based on the doctrine of sovereign immunity.

In this appeal, Foy/Ready-Mix argues that Cement Plant's bad faith dealing should operate to estop it from interposing the statute of limitations as a time-bar to the present action. They further assert that the Complaint sets out independent tort claims ancillary to the contract for sale, for which the U.C.C. provides a remedy. Finally, they contend that the Cement Plant, as a governmental agency, does not enjoy sovereign immunity from commercial tort claims liability.

The issues will be separately stated and so treated.

## I

WHETHER THE U.C.C. FOUR YEAR STATUTE OF LIMITATION WAS TOLLED BY CEMENT PLANT'S BAD FAITH AND CONCEALMENT OF FACTS UPON WHICH FOY/READY–MIX RELIED TO THEIR DETRIMENT?

For the purposes of deciding a motion to dismiss, this court must treat as true all facts properly pleaded in the complaint. *Selchert v. Lien,* 371 N.W.2d 791, 792 (S.D. 1985); SDCL 15–6–12(b). In Arcon Constr. Co. v. S.D. Cement Plant, 349 N.W.2d 407, 410 (S.D.1984), we held that

"when the legislature enacted the U.C.C. it expressly waived sovereign immunity for the Cement Plant whenever Cement Plant enters into contracts for the sale of goods."

Here, Cement Plant breached its contract with Ready-Mix by failing to timely deliver cement in July of 1978, at which time Foy/Ready-Mix's cause of action accrued. In accordance with SDCL 57A-2-725(1), Foy/Ready-Mix had four years from the time the cause accrued to bring an action for breach of the sales contract. Given that Foy/Ready-Mix commenced this suit in July 1984, it is undisputed that SDCL 57A-2-725(1) bars this action, unless the statute was tolled and Cement Plant estopped from raising it. SDCL 57A-2-725(4).[1]

The U.C.C., as codified by this jurisdiction in SDCL ch. 57A et seq., states that the principles of law and equity, which include estoppel, fraud, and misrepresentation, supplement the U.C.C. provisions. SDCL 57A-1-103. In accordance with SDCL 57A-1-203, Cement Plant is charged with a duty of good faith in carrying out its contractual obligations.

■ When Cement Plant made what appeared to be good faith allocations of cement in July and August of 1978, Foy/Ready-Mix believed that SDCL 57A-2-615[2] excused Cement Plant's breach of contract action for failure to timely deliver. It is Foy/Ready-Mix's position, however, that they were induced by these false and misleading allocations to alter their position, and consequently, refrain from seeking a legal remedy to recoup their losses caused by the breach, and during the pendency of the limitation period. Inasmuch as the U.C.C. is supplemented by principles of law and equity, and also provides for the tolling of the four year statute of limitations, we are convinced by this record that the doctrine of equitable estoppel should be applied to prevent Cement Plant from raising the statute of limitations defense.

This court has long recognized that a party may be estopped by his acts or conduct to claim what would otherwise be his legal rights. In *Willadsen v. Crawford,* 75 S.D. 161, 60 N.W.2d 692 (1953), we stated that an estoppel arises, where, by conduct or acts, a party has been induced to alter his position or do that which he would not otherwise have done to his prejudice. Similarly, in *Somers v. Somers,* 27 S.D. 500, 504, 131 N.W. 1091, 1093 (1911), we wrote:

To create an estoppel, there must have been some act or conduct on the party to be estopped, which has in some manner mislead the party in whose favor the estoppel is sought and has caused such party to part with something of value or to do some other act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights.

27 S.D. at 504; 131 N.W. at 1093; *Western Cas. & Sur. v. American Nat'l Fire Ins. Co.,* 318 N.W.2d 126, 128 (S.D.1982).

1. SDCL 57A-2-725. Statute of limitations in contracts for sale.

    ....
    (4) This section does not alter the law on tolling of the statute of limitations nor do they apply to causes of action which have accrued before July 1, 1967.

2. SDCL 57A-2-615 provides:
    Except so far as a seller may have assumed a greater obligation and subject to § 57A-2-614 on substituted performance;
    (a) Delay in delivery or nondelivery in whole or in part by a seller who complied with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
    (b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.
    (c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

In *Sander v. Wright*, 394 N.W.2d 896, 898 (S.D.1986), this court's most recent decision concerning equitable estoppel, we quoted from *Western Cas. & Sur., supra,* and then wrote:

In other cases, it has been stated that in order for equitable estoppel to exist, there must be fraud, false representations, or concealment of material facts. *Citing: Valley Bank v. Dowdy,* 337 N.W.2d 164 (S.D.1983); *Taylor v. Tripp,* 330 N.W.2d 542 (S.D.1983); *Spitzer v. Spitzer,* 84 S.D. 147, 168 N.W.2d 718 (1969); and *Cromwell v. Hosbrook,* 81 S.D. 324, 134 N.W.2d 777 (1965). In *Taylor, supra,* we expressed the elements of equitable estoppel as follows:

In order to constitute an equitable estoppel, [also known today as] estoppel in pais, false representations or concealment of material facts must exist; the party to whom it was made must have been without knowledge of the real facts; th[e] representations or concealment must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied thereon to his prejudice or injury. There can be no estoppel if any of these essential elements are lacking, or if any of them have not been proved by clear and convincing evidence.

330 N.W.2d at 545. As stated by Justice Fosheim in his concurrence in *Sander, supra,* federal courts have adopted the *Taylor* formulation as the correct statement of the doctrine in South Dakota. 394 N.W.2d at 900, *citing In re Sepco, Inc.,* 36 Br. 279, 286 (D.S.D.1984); *Canton Lutheran Church v. Sovik,* 507 F.Supp. 873, 879 (D.S.D.1981).

In May of 1984, Foy/Ready-Mix discovered that Cement Plant had oversold its 1978 production capacity, and thereby created the cement shortage itself. The present action was commenced in July, 1984. According to Foy/Ready-Mix, on June 1, 1978, Cement Plant, through public statements appearing in the Cement Plant Commission minutes, reaffirmed its policy to supply all South Dakota customers first, and to honor all contract commitments. *See: Reeves, Inc., v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). Shortly thereafter, however, Cement Plant entered into an agreement with Eisenhower Construction Company to supply 85,000 tons of cement for the Stapleton Airport project in Denver, Colorado. Cement Plant bid on this job in March of 1978 when it knew full well that there would be difficulty in fulfilling present commitments due to the cement shortage. Nevertheless, by the end of June 1978, Cement Plant made Eisenhower its first priority and gave it preferential treatment over all other customers.

On June 6, 1978, (the same date as the Eisenhower contract), Cement Plant purchased 20,000 tons of cement from the Medusa Cement Company with shipments to begin during the summer of 1978, and to be completed prior to October 31, 1978. On June 29, 1978, Cement Plant agreed to ship to Eisenhower one pound of cement for every pound it could have delivered from Medusa. The evidence shows that although Cement Plant was not yet receiving cement from Medusa, it continued to intentionally divert cement from the Rapid City plant to Eisenhower at the expense of South Dakota customers whose contracts were being dishonored. Despite this conduct, on July 27, 1978, as shown by the commission minutes, Cement Plant stated that it had made "minimal purchases" of cement from alternate sources to fulfill an outstanding obligation. In fact, Cement Plant had purchased substantial cement at a loss during 1977 and was again doing so in 1978.

We have held that a defendant may be estopped from raising the statute of limitations as a defense. *Sander, supra; Schuster v. Woodmen Accident & Life Co.,* 361 N.W.2d 286 (S.D.1985); *Jandreau v. Sheesley Plumbing & Heating Co.,* 324 N.W.2d 266 (S.D.1982); *Moody v. L.W. Tyler, Custom Combiners,* 297 N.W.2d 179 (S.D. 1980); *Arbach v. Gruba,* 89 S.D. 322, 232 N.W.2d 842 (1975). This court has not yet applied the U.C.C. tolling provisions to stay the four year breach of contract statute of

limitations, however, other jurisdictions have so held them applicable in conjunction with the doctrines of estoppel and fraudulent concealment.[3]

■ The U.C.C. provides for the application of all supplemental principles of law which are not displaced by its particular provisions. SDCL 57A–1–103. By definition, to toll a statute of limitations means to show facts which remove its bar of the action. *Hamilton v. Pearce*, 15 Wash.App. 133, 547 P.2d 866, 870 (1976) *quoting Black's Law Dictionary* 1658 (3rd rev. ed. 1914); 2 *Bouvier's Law Dictionary*, 3283 (3rd rev. ed. 1914). Here, Cement Plant's own actions created the cement shortage, and its misrepresentations about the cement allocations induced Foy/Ready-Mix into believing that they were made in good faith. Under this record, it would be unjust to allow Cement Plant to benefit from its own poor business decisions by now resorting to the statute of limitations to bar this action. Estoppel may be applied to prevent a fraudulent or inequitable resort to a statute of limitations. *MacMillen v. A.H. Robins Co., Inc.*, 217 Neb. 338, 348 N.W.2d 869, 871 (1984) *citing Luther v. Sohl*, 186 Neb. 119, 181 N.W.2d 268, 269 (1970).

A closely analogous factual situation is set forth in *Farmer's Elevator Co. of Elk Point v. Lyle*, 90 S.D. 86, 238 N.W.2d 290 (1976). In this case, we held that the doctrine of equitable estoppel could be applied to prevent the defendant from asserting the statute of frauds as a defense. We found that the plaintiff had detrimentally relied on the defendant's oral promise to deliver corn where it was shown that the plaintiff had already sold the corn to others in reliance. Thus, we used SDCL 57A–1–103, (formerly SDCL 57–1–25), to apply the doctrine of equitable estoppel as a supplementary principle of law to a U.C.C. case.

Similarly, we can toll the statute in the present case by using SDCL 57A–2–725(4), to apply the doctrine of equitable estoppel. The evidence shows that Foy and Ready-Mix detrimentally relied on Cement Plant's misrepresentations in regard to the cement allocations, and thus, refrained from bringing suit. SDCL 57A–1–203, charges Cement Plant with an obligation of good faith in the performance of its contracts. Conversely, Cement Plant's "bad faith" should prevent it from claiming what would otherwise be its legal rights, e.g., the statute of limitations defense.

In *United States v. Pall Corporation*, 367 F.Supp. 976, 979 (E.D.N.Y.1973), the court noted that cases interpreting Section 2–725 of the U.C.C. have held that fraud will suspend the running of the statute of limitations. In this case, the court held that the U.C.C. four year statute of limita-

**3.** See: *Walsh v. Ford Motor Co.*, 588 F.Supp. 1513, 1522 (D.C.Cir.1984) ("[R]ead into every federal statute of limitations, including the adoption of an analogous local statute of limitations ... the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." (citations omitted)); *MacMillen v. A.H. Robins Co., Inc.*, 217 Neb. 338, 348 N.W.2d 869, 871 (1984) ("One who wrongfully conceals a material fact necessary to the accrual of a cause of action against him, and such concealment causes the opposite party to delay the filing of suit cannot avail himself of the statutes of limitation as a defense ..."); *Sellon v. General Motors Corp.*, 571 F.Supp. 1094, 1099–1100 (D.Del.1983) ("Under Delaware law, a defendant's fraudulent concealment of a cause of action may toll the [U.C.C.] statute of limitations ... Knowledge of the alleged wrong and an affirmative act of concealment by a defendant are generally deemed to be essential for the application of the doctrine."). *B.F. Hirsch v. Enright Refining Co., Inc.*, 577 F.Supp. 339, 344 (D.N.J.1983) *modified* 751 F.2d 628 (3rd Cir.1984) ("[W]here there is fraudulent concealment of a cause of action the period of limitation will not commence until discovery of wrong or of facts which reasonably put one on notice."); *Hamilton v. Pearce*, 15 Wash.App. 133, 547 P.2d 866, 870 (1976) (*Held:* Enactment of the U.C.C. statute of limitations did not alter or modify in any respect the law on tolling.); *Ohio Brass Company v. Allied Products Corporation*, 339 F.Supp. 417, 424–425 (N.D.Ohio 1972) (Where foreign corporation was not licensed to transact business at the time it delivered defective stainless steel pins to purchaser in Ohio, four year limitation period for bringing breach of warranty cause of action was tolled until corporation was so licensed in Ohio.).

tions was tolled by Pall's concealment of facts concerning the inadequacy of certain pumps, and its further misrepresentation of same to the plaintiffs who were prevented from discovering the defects during the limitations period. Here, Cement Plant's public pronouncements about honoring all South Dakota customers first, despite the cement shortage, induced Foy/Ready-Mix into believing that the allocations were made in good faith, even though Cement Plant had created the shortage themselves, and was giving the Eisenhower project preferential treatment.

Under the rulings in *Taylor* and *Farmers Elevator, supra*, we are satisfied that Foy/Ready-Mix has proven the essential elements of equitable estoppel. We note that whether Foy/Ready-Mix can demonstrate at trial that Cement Plant's fraudulent concealment tolled the statute is a fact question reserved for the trier of fact. *See: Aube v. O'Brien*, 140 Vt. 1, 433 A.2d 298, 300 (1981). Accordingly, we hold that Cement Plant's motion to dismiss was improperly granted. *See: Shinabarger v. Jatoi*, 385 F.Supp. 707 (D.S.D.1974).

## II

### WHETHER FOY/READY-MIX STATE INDEPENDENT TORT CLAIMS ANCILLARY TO THE CONTRACT FOR SALE?

As previously noted, the trial court dismissed this action based solely upon the running of the four year statute of limitations. SDCL 57A-2-725. Since we have determined that this litigation should proceed under the theories of tolling, fraudulent concealment and equitable estoppel, it becomes unnecessary to decide whether independent tort claims have been stated by Foy/Ready-Mix. Accordingly, we leave this issue for resolution at another time.

It is now necessary, however, to direct our attention to Cement Plant's claim that it is immune from the tort claims based on the doctrine of sovereign immunity.

## III

### WHETHER CEMENT PLANT ENJOYS SOVEREIGN IMMUNITY FROM FOY/READY-MIX'S COMMERCIAL TORT CLAIMS?

The trial court held that the Cement Plant is protected by sovereign immunity from all of the tort claims asserted by Foy/Ready-Mix.

Foy/Ready-Mix contend that the application of the doctrine of sovereign (governmental) immunity to the Cement Plant in its commercial activities is clearly distinguishable from the application of the doctrine of sovereign immunity to the State's general governmental functions. We agree.

The governmental function of the State can be generally defined as the State's obligation to provide for the health, safety or general welfare of the public generally. The Cement Plant was created solely for the purpose of engaging in a commercial function and is wholly unrelated to any governmental function of the State. Where the State elects to operate a business enterprise solely for commercial purposes, it ought not be permitted to avoid its legal responsibility by invoking the doctrine of governmental immunity. The Cement Plant should be amenable to suit for mismanagement, bad faith actions and negligent conduct, just as the private sector is made responsible.

It would appear safe to say that when authorization for Cement Plant operations appeared in our constitution, it created an agency of state government with independent proprietary powers or functions, and sufficiently independent from the State to be sued.

In *Arcon, supra*, this court never reached the question of tort immunity for Cement Plant. However, the *Arcon* decision relied on *In Re Opinion of the Judges*, 43 S.D. 635, 177 N.W. 812 (1920), for the proposition that the people's adoption of Article XIII, §§ 10 and 11 of the South Dakota Constitution was intended to take the state cement plant's operations out

from under any and all other sections of the state constitution. In *Arcon's* dissent, Chief Justice Fosheim indicated that Cement Plant is fully subject to lawsuits and that the constitutional provision on sovereign immunity is wholly inapplicable to Cement Plant's commercial operations. Inasmuch as we have already waived sovereign immunity for claims sounding in contract, we find that holding Cement Plant responsible for its commercial torts is a logical extension of *Arcon* in conjunction with the intent and meaning of the U.C.C.

■ The question of whether a corporation created as an agency of the state is subject to or immune from suit, and the extent of such subjection or immunity, is one of legislative intention. 72 Am.Jur.2d *States, Territories, and Dependencies* § 105 (1974). The mere fact that such a corporation is an agency of the state does not in and of itself render it immune from suit. *Id.* It has been held as a matter of policy that such corporations should be subject to suit, especially when embarking upon commercial ventures. *Id.* According to § 106:

> The purpose for which a governmental corporation is created or the function which it is designed to fulfill is generally regarded as of importance in determining whether such a corporation is subject to suit. For example, where a state creates or organizes a corporation and operates same for a commercial purpose, it is ordinarily held subject to suit, the same as any public corporation organized for the same purpose.

*See also:* 81A C.J.S. *States* § 306 (1977).

The State Cement Plant is regulated by SDCL ch. 5–17 et seq. SDCL 5–17–1 declares that the manufacture, distribution, and sale of cement and cement products are public purposes impressed with a public use and as such, are governmental functions subject to regulation by the state. *See also:* South Dakota Const., art. XIII, §§ 10 and 11. According to *Reeves, supra,* when South Dakota undertook plans to build the cement plant in 1919, the project was initiated in response to recent regional cement shortages. In 1920, the South Dakota Cement Commission anticipated that there would be a ready market for the plant's entire output within the confines of the state. However, the plant soon produced more cement than South Dakotans could use. Thus over the years, buyers in no less than nine neighboring states purchased cement from the plant. Between 1970 and 1977, some 40% of the plant's output went outside the state of South Dakota. 447 U.S. at 430–432; 100 S.Ct. at 2274, 65 L.Ed.2d at 247–248. The fact that Cement Plant expanded its business beyond the borders of South Dakota and currently exports nearly half of its cement production to out-of-state customers, prompts the comparison of Cement Plant's commercial transactions to those of a state-run corporation which is operated for commercial purposes and is generally held subject to suit.

In *Schippa v. West Vir. Liquor Control Com'n,* 132 W.Va. 51, 53 S.E.2d 609 (1948), the plaintiff sued the West Virginia Liquor Control Commission, a corporation, to recover the price paid for undelivered liquor. The court found that when a state organizes and creates a corporation and operates it for a commercial purpose, it is generally subject to suit the same as any private corporation organized for the same purpose. However in this case, the court found that the Liquor Commission was performing essentially public or governmental purposes under the "police powers" of the state, and was in effect a part of government. Thus, the court held that the Liquor Commission was immune from suit. *Id.* at 613–614.

In *People v. Superior Court,* 29 Cal.2d 754, 178 P.2d 1 (1947), the sovereign immunity of the state from liability for tort, (as distinguished from its immunity from suit), was not extended to acts of its agents performed in a proprietary, as contrasted with a governmental enterprise. The court held that while the statute authorizing suits against the state did not amount to a waiver of the sovereign's governmental immunity from liability, a negligence suit

might be brought thereunder for negligence in the operation of a railroad *which constituted an industrial or business enterprise as distinguished from a governmental one.* (emphasis added).

Similarly, in *Choctaw Pressed Brick v. Townsend,* 108 Okl. 235, 236 P. 46 (1925), the plaintiff brought suit against the warden of the state penitentiary and others, to enjoin them from selling convict made pressed brick which did not bear the label, "convict made goods," as required by statute. The trial court held that the suit was against the state, and thus, not maintainable. *Id.* at 47. In reversing, the court stated:

> It is contended that injunction will not issue against defendants ... But it must be borne in mind that the state, in engaging in a mere business enterprise, is not thereby discharging a governmental function, but is a mere business institution, the same as a corporation or partnership or an individual.

*Id.* at 49.

Immediately thereafter the court noted that the Oklahoma Constitution authorizes the state to engage in business at its discretion; however, when the state elects to engage in business it becomes a "mere business institution," and as such, subject to the same constitutional and statutory requirements as are other business enterprises. *Id.* Similarly, *State Insurance Fund v. Bone,* 344 P.2d 562 (Okl.1959), held a state enterprise a proprietary function not enjoying sovereign immunity. The court held:

> [W]e now hold that the State Insurance Fund is a business enterprise as distinguished from purely governmental activities, and tort liability attaches and may be adjudicated.

*Id.* at 569. *See also: Hershel v. University Hospital Foundation,* 610 P.2d 237 (Okl.1980).

However, in *High-Grade Oil Co. v. Sommer,* 295 N.W.2d 736, 738 (S.D.1980), we wrote, "[t]his court has recognized the rule that as to the state there is no distinction between governmental and proprietary functions." *See also: State v. Board of Commissioners,* 53 S.D. 609, 632–633, 222 N.W. 583, 593 (1928). In *High-Grade,* we invoked the doctrine of sovereign immunity to bar an action against the Director and State Highway Engineer of the Division of Highways, for the allegedly negligent design and construction of a stretch of highway upon which a collision occurred. 295 N.W.2d at 738. The sovereign immunity issue was confined to the doctrine as applied to the state level of government, and the review of immunity was limited to actions at law for tort. *Id.* In declining to abrogate the doctrine of sovereign immunity by judicial fiat, we stated:

> We are not disposed to overrule this precedent for several reasons. First, while we agree that the doctrine is 'judge made law,' we are reminded that it is a doctrine of long standing; so long in fact, that it antecedes the federal and state constitutions. Our state constitution took cognizance of it when it ... provided Article III, § 27 ...
>
> . . . .
>
> And further, '[f]or reasons stated, we adhere to the opinion that if there is to be a departure from the rule of governmental immunity it should result from legislative action.'

*Id., quoting Conway v. Humbert,* 82 S.D. 317, 324–325, 145 N.W.2d 524, 529 (1966).

Article III, § 27 of the South Dakota Constitution provides that the Legislature shall direct by law in what manner and in what courts suits may be brought against the state. In the absence of legislative enactment, the State is immune from suit and liability for tort. As mentioned previously, however, the *Arcon* decision held that by enacting the U.C.C., the Legislature expressly waived sovereign immunity for actions against Cement Plant for breach of contract. In the present case, Foy/Ready-Mix contend that all of their commercial tort claims involve obligations and remedies within the intent and meaning of the U.C.C. As contrasted with *High-Grade,* Foy/Ready-Mix's claims are not for personal injury. The U.C.C. states

that remedies for breach of any "obligation" collateral or ancillary to a contract for sale are not impaired by the U.C.C. SDCL 57A–2–701. Therefore, Foy/Ready-Mix's tort claims for fraud and deceit, negligent misrepresentation, and tortious interference with contract, are maintainable under the rule in *Kunkel v. United Security Ins. Co. of N.J.*, 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969), which recognized that independent obligations may accrue as a matter of law even though the parties operate in a contractual setting.

We do not believe this finding, that Cement Plant may be held liable for its commercial torts and thus, has waived sovereign immunity from such claims, is inconsistent with *High-Grade, supra.* This court's decision in *Arcon*, Article XIII, §§ 10 and 11 of the South Dakota Constitution, the practical operations of Cement Plant itself, and the express provisions of the U.C.C., convince us that Cement Plant should be held fully accountable for both its contract and commercial tort claims. As stated initially, the Legislature's adoption of the U.C.C. served to waive Cement Plant's sovereign immunity for breach of contract for the sale of cement. Our decision here to extend this waiver to commercial tort claims is expressly limited to the operations of Cement Plant, and does not affect the general rule set forth in *High-Grade, supra.*

Accordingly, the dismissal of Foy/Ready-Mix's action is vacated, and the cause remanded in accordance with this opinion.

MORGAN, J., concurs.

HENDERSON, J., concurs in part, concurs in result in part and concurs specially in part.

WUEST, C.J., and FOSHEIM, Retired Justice, concur in result in part and dissent in part.

SABERS and MILLER, JJ., not having been members of the Court at the time this action was submitted to the Court, did not participate.

HENDERSON, Justice (concurring in part; concurring in result in part; and specially concurring in part).

## ISSUE I

### CONCUR IN RESULT

I concur in the result as to Issue I.

Perhaps it is true that, facially, the elements are here present, as compared to a parallel situation in *Farmers Elevator Co. of Elk Point v. Lyle*, 90 S.D. 86, 91, 238 N.W.2d 290, 293 (1976), which would trigger the Doctrine of Equitable Estoppel. Therefore, the Doctrine of Equitable Estoppel is applicable under the U.C.C. to prevent the State Cement Plant from asserting the statute of limitations. We have before us, apparently, a rather strong set of facts to attempt to prove fraudulent concealment. Plaintiffs make a rather strong showing that the State Cement Plant covered up in its overselling of the Plant's capacity to produce cement and involving itself in secret preferential treatment for certain customers. Though, as I say, we have a set of facts that might, by their sheer force, fit nicely into *Western Casualty*, 318 N.W.2d 126, and *Taylor*, 330 N.W.2d 542, both cited in the majority opinion, there are times and factual scenarios which can create the triggering of equitable estoppel without benefit of fraud as an element. *See Sander v. Wright*, 394 N.W.2d 896 (S.D.1986), for this author's continuing views and his past writings on this subject.

## ISSUE II

### SPECIAL CONCURRENCE

I specially concur as to Issue II.

I disagree that the independent tort claims by the plaintiffs should remain untreated in this opinion. I know of no reason why plaintiffs cannot proceed under alternative theories which sound in either contract or in tort. Plaintiffs would, under my rationale, be permitted to pursue their independent tort claims. Plaintiffs' amended complaint sets forth tort claims for: (1)

fraud and deceit, (2) negligent misrepresentation, and (3) tortious interference with contract. These all allegedly arise from commercial dealings and transactions between these parties.

The trial court dismissed all of these causes of action "since they arise out of a contract cause of action and are based on contract theory." There may be independent duties which exist concurrently with, and are separately imposed upon, a contractual relationship.

It is settled law in this state that a breach of duty may arise from a contractual relationship, and while matters complained of may have their origin in contract, the gist of an action may be tortious. *Smith v. Weber,* 70 S.D. 232, 16 N.W.2d 537 [ (1944) ]. Conduct which merely is a breach of contract is not a tort, *but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability. Weeg v. Iowa Mutual Ins. Co.,* 82 S.D. 104, 141 N.W.2d 913 [ (1966) ].
*Kunkel v. United Security Ins. Co. of N.J.,* 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969) (emphasis added).

Further, in *Smith v. Weber,* 70 S.D. 232, 16 N.W.2d 537 (1944), we recognized the tort of bad faith upon a landlord even though there was a contract existent between the parties.

" 'It may be granted that an omission to perform a contract obligation is never a tort, *unless that omission is also an omission of a legal duty.* But such legal duty * * * may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud.' *A tort may grow out of or make part of, or be coincident with a contract.* The fact that there existed a contract between the plaintiffs and the defendant would not immune the latter from the penalty that is ordinarily visited upon tortfeasors. * * * * "

It may be conceded that tort usually signifies a breach of legal duty independent of contract. But such breach of duty may arise out of a relation or state of facts created by contract. Cooley on Torts, 4th Ed., § 60; *John Moodie Dry Goods Co. v. Gilruth,* 35 S.D. 567, 153 N.W. 383 [ (1915) ]. *While the matters complained of by plaintiff had their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant.*
*Smith v. Weber,* 70 S.D. at 236–37, 16 N.W.2d at 539 (citations omitted; emphasis added).

In *Weeg v. Iowa Mut. Ins. Co.,* 82 S.D. 104, 109–10, 141 N.W.2d 913, 916 (1966), we stated:

Conduct that is merely a breach of contract is not a tort. The contract, however, *may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to a tort liability. The rule is thus stated in Shearman & Redfield, Law of Negligence (6th Ed.) § 116, as follows:* "Negligence which consists merely in the breach of a contract will not afford ground for an action by any one, except a party to the contract, or a person for whose benefit the contract was avowedly made. * * * But where, in omitting to perform a contract, in whole or in part, *one also omits to use ordinary care to avoid injury to third persons, who, as he could with a slight degree of care foresee, would be exposed to risk by his negligence, he should be held liable to such persons for injuries which are the proximate result of such omission."* (Citation omitted; emphasis added.)

So, there is ample authority upon which the plaintiffs' independent tort claims may be asserted. Obviously, some cases lend themselves to the discussion of both contract and tort liability and I submit that the

case presently before us is such an example.

I also note that the U.C.C. itself specifically provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to ... estoppel, fraud, misrepresentation ... or other validating or invalidating cause shall supplement its provisions." SDCL 57A–1–103. *See Farmers Elevator,* 90 S.D. at 90–91, 238 N.W.2d at 293. Therefore, tort law of this state is supplemented, not replaced, by SDCL 57A–1–103. Since it appears that plaintiffs possess both contract and tort claims against State Cement, we should allow both types of actions to be presented. Plaintiffs should not be forced to waive a valid tort claim simply because they also possess a valid contract claim. Lastly, the tort claims are subject to non–U.C.C. statute of limitations provisions which would not likely have expired in this instance. SDCL 15–2–3 and SDCL 15–2–13(1), (6). 5 R. Anderson, *Anderson On the Uniform Commercial Code,* §§ 2–725, 2–725:63 (3d ed. 1984). Plaintiffs therefore should be permitted to proceed on both theories, contract and tort, against State Cement.

## ISSUE III

### CONCURRENCE

I concur as to Issue III.

I concur, totally, in the sovereign immunity aspect of this writing of the majority opinion.

FOSHEIM, Retired Justice (concurring in result in part and dissenting in part).

I agree with the majority that Cement Plant may be estopped from raising a statute of limitations defense to contractual causes of action. As I stated in my *Arcon Const. Co. v. Cement Plant,* 349 N.W.2d 407 (S.D.1984) dissent, Cement Plant's contractual sovereign immunity waiver emi-

nates from Article XIII, § 11 of the South Dakota Constitution wherein the state is expressly authorized to pledge its credit in connection with the plant. Because I agreed with the *Arcon* majority that Cement Plant has contractual liability exposure, I also agree with the current majority that the plant should not be allowed to defeat this constitutionally supplied concept by conduct sufficiently inequitable to operate an estoppel against it. *See Sander v. Wright,* 394 N.W.2d 896 (S.D.1986) (Fosheim, C.J., concurring in result).

I part with the majority, however, as to which statute of limitation applies to contractual actions pursued against Cement Plant. As my *Arcon* dissent also noted, the UCC does not govern the period of limitation in which Cement Plant is exposed to contractual liability. Instead, the more specific SDCL 21–32–2 should apply. *See Arcon* (Fosheim, C.J., dissenting). That statute provides that "[a]ction on any claim on contract or tort against the state shall be commenced within one year after same has arisen." Because I disagree as to which statute of limitations applies, I concur only in the result of that portion of the majority's opinion which holds Cement Plant may be estopped from presenting a statute of limitations defense.

I dissent from that portion of the majority opinion which extends the *Arcon* sovereign immunity waiver for Cement Plant to "commercial torts." Contrary to the assertion made therein, I did not intend by my *Arcon* dissent to imply that I believed "the constitutional provision on sovereign immunity is wholly inapplicable to Cement Plant's commercial operations." (399 N.W. 2d at 347.) To the contrary, there is a fundamental difference between Cement Plant's contractual and tort liability which makes it logical to interpret Article XIII, § 11 * as waiving immunity for the former liability, but not the latter.

As the *Arcon* majority stated:

> the credit of the state, to provide funds for the purposes enumerated in § 10 of this article, any

---

* S.D. Const. art. XIII, § 11 states:
  The state may pledge such cement plants and all of the accessories thereto, and may pledge

How can the state pledge its credit for cement plant operations if its credit obligations are not legally enforceable, or what business would contract with the cement plant if the cement plant is shielded from satisfying its contractual obligations? There can be no pledge of state credit without an obligation which is legally enforceable against the state.

349 N.W.2d at 411 (citations omitted). This basis which dictates that Cement Plant be amenable to its contracts does not exist regarding the plant's tort liability.

Because our constitution does not abolish Cement Plant's tort liability, only the legislature may do so. As the *Arcon* majority again stated:

Article III, section 27 of the South Dakota Constitution provides: 'The Legislature shall direct by law in what manner and in what courts suits may be brought against the state.' Accordingly, we have consistently held that it is the exclusive province of the legislature and not the courts to abrogate or limit the doctrine of sovereign immunity. In the absence of an express statutory waiver, we strictly adhere to this constitutionally mandated doctrine.

349 N.W.2d at 410 (citing *Kringen v. Shea,* 333 N.W.2d 445 (S.D.1983); *Merrill v. Birhanzel,* 310 N.W.2d 522 (S.D.1981); *High-Grade Oil Co., Inc. v. Sommer,* 295 N.W.2d 736 (S.D.1980); *Arms v. Minnehaha County,* 69 S.D. 164, 7 N.W.2d 722 (1943)).

The only statutory provision the present majority cites as supporting its tort immunity erasure is SDCL 57A-2-701. This UCC provision provides: "Remedies for breach of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of this chapter." This language is obviously a far cry from an express abolition of tort immunity. By holding such a waiver exists, the majority does precisely what this court announced in *Arcon* and cases cited therein that it would not do—abrogate sovereign immunity by judicial fiat.

provision in this Constitution to the contrary

I am authorized to state that WUEST, C.J., joins in this concurrence in result in part and dissent in part.

