2002 SD 5

**CORNER CONSTRUCTION COMPANY, a corporation, Plaintiff and Appellant,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation; and Cummings & Roll, Ltd., a corporation, Defendants and Appellees,**

**Regent Insurance Company, a corporation; and Continental Insurance Company, a corporation, Defendants.**

Nos. 21880, 21888, 21897.

Supreme Court of South Dakota.

Argued Nov. 16, 2001.

Decided Jan. 9, 2002.

Veronica L. Duffy, Joseph M. Butler of Bangs, McCullen, Butler, Foye and Simmons, LLP, Rapid City, for plaintiff and appellant.

Scott Sumner, Jerry D. Johnson of Banks, Johnson, Colbath, Kerr & Sumner, LLC, Rapid City, for defendants and appellees United States Fidelity & Guaranty Co.

William A. May of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, for defendants and appellees Cummings & Roll, Ltd.

SABERS, Justice.

[¶ 1.] Corner Construction Company (Corner) filed an action seeking a declaratory judgment against United States Fidelity and Guaranty Company (USF & G) alleging that there was coverage for the faulty work of Corner's subcontractors under its existing insurance policies. Corner also filed an action against Cummings and Roll (C & R) alleging that C & R had negligently advised Corner that there was no insurance coverage under its insurance policies. USF & G and C & R moved for summary judgment. The trial court granted summary judgment for USF & G holding that there was coverage under the insurance policies, but Corner was not covered because it failed to give proper notice. The trial court denied C & R's motions. USF & G and C & R appeal on: (1) the issue of coverage. C & R also appeals: (2) the trial court's decision that Corner's claim was not barred by the applicable statute of limitation. Corner appeals on: (3) the issue of notice. We affirm Issue 1 in part and remand for factual determinations on Issues 1, 2 and 3.

## FACTS

[¶ 2.] On May 29, 1986, Corner, as a general contractor, entered into a contract with Rapid City and the Rapid City School District (City/School) for the construction of a 65,000 square-foot, three-story, school administration building. Corner was required to perform all the work under the contract in constructing the building. Corner was responsible for the quality of its work and that of its subcontractors. It warranted that all work done on the building, including that done by its subcontractors, would be of good, workmanlike quality.

[¶ 3.] Corner hired three subcontractors to perform various portions of the construction. Cub Acoustical was hired to do the insulation work and the building's external thermal envelope. Aldrich Air Conditioning was hired to install the heating and ventilation system. Tile Setters was hired to construct a fountain outside of the building. The subcontractors commenced work in early 1987.

[¶ 4.] City/School occupied the building in the latter part of 1987. Almost immediately after moving in, City/School began experiencing problems with the building's heating and ventilation system, the concrete floor and the outdoor fountain. City/

School investigated further and discovered construction and design deficiencies.

[¶ 5.] The general contract between Corner and City/School provided for mandatory arbitration with any award to be final and conclusive. In September 1992, City/School advised Corner that it planned to initiate an arbitration proceeding regarding the work of Corner's subcontractors. City/School claimed damages in excess of $1 million.

[¶ 6.] Corner was insured by USF & G under a standard comprehensive general liability policy (CGL). The policies were issued by USF & G and countersigned by its general agent, C & R. They furnished completed operations coverage. Attached to the general policy was a broad form property damage endorsement (BFPDE) for which Corner paid an additional premium.

[¶ 7.] After Corner was advised of the pending arbitration proceeding, Corner's president, Sherwood Corner, asked C & R whether Corner would be covered by its insurance policies for the faulty workmanship of its subcontractors and for the defense of the arbitration claim. Ross Roll, one of the owners of C & R, advised Corner's president that there was no coverage for the subcontractors' work or for Corner under the CGL policy.

[¶ 8.] City/School filed a demand for arbitration against Corner and the building architect. A hearing was held on October 12, 1994. In November 1994, City/School was awarded $180,500 against Corner and $98,500 against the architect.

[¶ 9.] In September 1997, Corner brought an action for declaratory judgment against USF & G. Corner also brought an action against C & R alleging that C & R negligently and erroneously advised Corner that there was no liability insurance coverage. Against USF & G, Corner sought a declaration that its CGL policy furnished liability coverage to Corner for damages caused by the faulty workmanship of Corner's subcontractors. Corner also requested reimbursement for the costs of defending the arbitration proceeding and the amount paid in satisfaction of the arbitration award. Against C & R, Corner requested damages for C & R's negligence in advising Corner that there was no coverage available under its policy for the faulty workmanship of its subcontractors.

[¶ 10.] USF & G filed a motion for summary judgment claiming that the CGL policy did not cover liability for damages caused by Corner's subcontractors and, in the alternative, that Corner failed to comply with the policy provisions relating to notice. C & R filed motions for summary judgment claiming that there was no coverage under the policies and that Corner's suit was barred by the three-year limitation period in SDCL 15–2–14. The trial court determined that the BFPDE of the CGL policy covered Corner for the faulty workmanship of its subcontractors. It ultimately held, however, that there was no liability for coverage because Corner failed to comply with the written notice provision of the CGL policy and that USF & G did not waive the written notice provision. The trial court granted summary judgment in USF & G's favor. The trial court denied C & R's motions for summary judgment.

## STANDARD OF REVIEW

[¶ 11.] Our standard of review for summary judgment is well established and is "whether a genuine issue of material fact exists and whether the law was correctly applied." *Manuel v. Wilka*, 2000 SD 61, ¶ 17, 610 N.W.2d 458, 462 (citing *Parmely v. Hildebrand*, 1999 SD 157, ¶ 7, 603 N.W.2d 713, 715–16 (citations omitted)).

[¶ 12.] "When interpreting insurance contracts, we have uniformly held them reviewable as a matter of law under the de novo standard." *National Sun Indus., Inc. v. S.D. Farm Bureau Ins. Co.*, 1999 SD 63, ¶ 7, 596 N.W.2d 45, 46 (citing *Opperman v. Heritage Mut. Ins. Co.*, 1997 SD 85, ¶ 3, 566 N.W.2d 487, 489 (additional citations omitted)).

[¶ 13.] **1. WHETHER CORNER IS AFFORDED COVERAGE UNDER THE BROAD FORM PROPERTY DAMAGE ENDORSEMENT OF ITS CGL POLICY FOR THE FAULTY WORKMANSHIP OF ITS SUBCONTRACTORS.**

■ [¶ 14.] The pertinent provisions of Corner's insurance policies are those relating to bodily injury liability and property damage liability. The policies provide that:

> The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:
>
> A. bodily injury, or
>
> B. property damage
>
> to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

Under the exclusion provisions of the policies, the insurance does not apply to:

property damage to *work performed by or on behalf of the Named Insured* arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

(Exclusion (*o*) (emphasis added)). The BFPDE, specifically section VI(A)(3), purchased by Corner modifies the above exclusion of the basic policy as follows:

> VI. Broad Form Property Damage Liability Coverage (Including Completed Operations)
>
> (A) Exclusions (k) and (*o*) are replaced by the following:
>
> (3) with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations" to property damage to *work performed by the named insured* arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.

(emphasis added).

[¶ 15.] The 1973 version of the BFPDE eliminated the phrase "on behalf of" when discussing whose work is covered by the policies. In 1986, this CGL policy was amended, essentially incorporating the 1973 BFPDE endorsement section VI(A)(3) into the basic policy as exclusion L. This new provision is as follows:

> 1. "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

[¶ 16.] USF & G and C & R argue that there is no coverage available for Corner under its policies because USF & G is not legally obligated to insure against the faulty work of Corner's subcontractors. USF & G and C & R argue that the omission of the phrase "on behalf of" from the policy provisions does not extend coverage to subcontractors. Furthermore, USF & G and Corner claim that Corner is attempting to obtain coverage for its own liability under its contract with City/School and that the relevant insurance policies were intended to cover tort, not contract, liability.

[¶ 17.] The BFPDE exclusion operates when there is a completed operation as defined by the insurance policy. The BFPDE's completed operations hazard provision is intended to provide coverage for risks that arise after the completion of a construction project, as here. *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.,* 864 F.2d 648, 649–50, (9thCir.1988) (citing Dean Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb.L.Rev. 415, 441 (1971)). "The idea behind this exclusion is that liability insurance should not be a warranty or performance bond for general contractors because they control their work." *Fireguard Sprinkler Sys., Inc.,* 864 F.2d at 650 (citing *Southwest Forest Indus. v. Pole Bldgs., Inc.,* 478 F.2d 185, 187 (9thCir.1973)).

[¶ 18.] The primary issue is whether a completed operations hazard exclusion in an endorsement to a CGL policy excludes coverage for damage to the final product, caused by the faulty work of subcontractors. Of key importance is whether the elimination of the phrase "on behalf of," from the completed operations hazard provision, provides coverage for a named insured's subcontractors. The question be-

comes whether a subcontractor's work is a separate insurable risk.

[¶ 19.] A split of authority exists on this issue. One line of authority adopts the position that, because of the language of the CGL policies and their exclusions and endorsements, as well as the interpretation of these policies by the insurance industry, the work of subcontractors is covered. *See Fireguard Sprinkler Sys.,* 864 F.2d at 651 (holding that the completed operations hazard provision in the BFPDE does not preclude coverage for losses caused by the work of subcontractors); *Fejes v. Alaska Ins. Co.,* 984 P.2d 519 (Alaska 1999) (same); *McKellar Dev. of Nevada, Inc. v. Northern Ins. Co.,* 108 Nev. 729, 837 P.2d 858 (1992) (same); *Maryland Casualty Co. v. Reeder,* 221 Cal. App.3d 961, 270 Cal.Rptr. 719 (Cal.App. 4 Dist.1990) (same); *Southwest La. Grain Inc., v. Duncan, Inc.,* 438 So.2d 215 (La. App.1983) (same).

[¶ 20.] The other line of authority adopts the position that the elimination of the phrase "on behalf of" is of little significance and that CGL policies were only intended to insure against tort liability for physical damage to others. *See Bor–Son Bldg. Corp. v. Employers Commercial Union Ins. Co. of Am.,* 323 N.W.2d 58 (Minn. 1982) (holding that the completed operations hazard provision does not recognize the faulty work of subcontractors as a separate insurable risk); *Blaylock v. AIU Ins. Co.,* 796 S.W.2d 146 (Tenn.Ct.App. 1990) (same).

[¶ 21.] The courts that have found coverage for the faulty work of subcontractors have done so on the basis that the language of the completed operations hazard exclusion in the BFPDE does not preclude such coverage. *Fireguard Sprinkler Sys.,* 864 F.2d at 651. These courts have interpreted the deletion of the phrase "on behalf of" as significant. The deliberate

omission of the phrase lends credence to the position that the coverage exclusion in the completed operations hazard provision was only to apply to work performed by the named insured and not to subcontractors.

[¶ 22.] Furthermore, *Fireguard Sprinkler Systems* and its progeny have stated that the purpose of insurance is to insure against risks. Because a "general contractor's liability policy insures against risks outside his or her control, such a risk surely can arise from a subcontractor's work." *Id.* at 653. Specifically,

> [u]nder the usual coverage [ ] the insured has no insurance whatsoever for damage to a subcontractor's work or for damage to his own work resulting from a subcontractor's work. Therein lie the advantages of Broad Form Property Damage coverage including Completed Operations. Consequently, if an insured does not anticipate using subcontractors, the value of purchasing Broad Form Property Damage coverage *with Completed Operations* is questionable, in view of the additional premium required for it.

*Id.* at 652 (emphasis in original).

[¶ 23.] These courts have also looked at extrinsic evidence, particularly from the insurance industry, to determine the meaning of the completed operations hazard provision. According to one industry publication:

> [t]he broad form property damage endorsement "eliminates coverage for property damage to work performed by the named insured if the property damage arises out of the named insured's work or any portion of it. Thus, an insured has coverage for his completed work when the damage arises out of work performed by someone other than the named insured, such as a subcontractor.... The usual Completed Operations coverage (no Broad Form Property Damage endorsement attached) flatly excludes property damage to work performed by or on behalf of the named insured arising out of the work."

*Maryland Casualty Co.*, 221 Cal.App.3d at 972, 270 Cal.Rptr. 719 (citing August, 1982, Fire Casualty & Surety Bulletin, published by the National Underwriters Association). Another frequently cited publication dismisses the idea that because a subcontractor's work becomes part of the final product, it cannot be viewed as a separate insurance risk. *Id.* at 976, 270 Cal.Rptr. 719.

> The editors have heard of instances in which insurers have denied coverage ... on the ground that the policy exclusion of injury to the named insured's products (which is not amended by the Broad Form endorsement) eliminates coverage for any damage to the completed building, the completed building being a "product" of the named insured. In the opinion of the editors, that reasoning ignores the distinction between the "completed operations hazard" and the "named insured's products" in the policy definitions. Moreover, that reasoning precludes any possibility of recovery under the Completed Operations feature of the Broad Form Endorsement, a feature for which the insured has presumably paid an additional premium.

*Id.*

[¶ 24.] The courts that have declined to find coverage for the faulty work of subcontractors have held that, when a general contractor enters into a contract, it assumes certain risks. *Bor–Son Bldg. Corp.*, 323 N.W.2d at 61; *Blaylock*, 796 S.W.2d at 154. The *Bor–Son* court stated that "[i]ncluded in those risks was the obligation to construct buildings free from defects and to remedy, on demand, any defects discovered within a year of completion." *Bor–*

*Son Bldg. Corp.*, 323 N.W.2d at 61. The court ultimately concluded that "[s]ince the alleged building damages were the result of alleged breach of contract, there was no duty on [the insurer], the comprehensive general liability insurer, to defend the [ ] actions not to indemnify [the general contractor] for its contribution toward the settlement of those actions."[1] *Id.* at 62.

■ [¶ 25.] Here, the trial court determined that the insurance policies issued by USF & G "would have required [USF & G] to defend and indemnify [Corner] with respect to the claim made against [Corner] in connection with the construction of the City/School Administration building[.]" We agree, but only to the extent that the subcontractor's defective work resulted in an accident or occurrence which resulted in property damage to the completed work of the general contractor and subcontractors.

[¶ 26.] In order to qualify for such coverage, Corner must show that the insuring clause under its policies is satisfied. The insuring clause states:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
> B. property damage

to which this insurance applies, caused by an occurrence[.]

[¶ 27.] Generally, the CGL policy, together with the BFPDE exclusion, will not provide coverage for the subcontractor's faulty workmanship, unless it results in an accident or occurrence which results in property damage to the work. *See generally, Haugan v. Home Indem. Co.*, 86 S.D. 406, 414, 197 N.W.2d 18, 22 (1972) (holding that "there is no liability coverage afforded by the policies for damages caused by and confined to the insured's own work or product"). If, however, the subcontractor's faulty workmanship results in damage to other property, the damage will be covered. *See id.* (holding that "when the insured's work or product actively malfunctions and causes damages to other property coverage is afforded.").

[¶ 28.] Furthermore, the property damage must be caused by an occurrence. An "occurrence" is defined as an "accident" which is an event that is "undesigned, sudden, and unexpected." *Taylor v. Imperial Casualty*, 82 S.D. 298, 144 N.W.2d 856, 858 (1966) (citing *Neale Const. Co. v. U.S. Fidelity and Guar. Co.* 199 F.2d 591 (10Cir.1952)) (additional citations omitted).

■ [¶ 29.] As required by the insuring clause, there was an accident or

---

1. The courts that have followed this line of reasoning have adopted the following premise regarding CGL policies:

   [t]he risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work *itself*, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an

obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Bor-Son Bldg. Corp.*, 323 N.W.2d at 63. Ultimately, the work performed by the subcontractors becomes the work of the general contractor and is therefore not a separate insurable risk.

unintended event, resulting in property damage that was neither expected nor intended by the insured, at least in respect to the following: Cub, which was hired to do the insulation work, left voids in the insulation between the studs and failed to securely attach the vapor barrier. The vapor barrier fell, causing temperature fluctuations and other ventilation problems. As a result, Corner's own work was damaged by the faulty work of its subcontractor. Corner was forced ·to remove the drywall, fix the vapor barrier, replace the drywall, and then retape, retexture and repaint the portions of the building that had been damaged. Such damage is covered by the insuring clause in connection with the BFPDE. Accordingly, we affirm the trial court's finding of coverage for Corner to this extent under the policy. When viewed in a light most favorable to Corner, we conclude that some of the facts giving rise to this lawsuit are within the coverage of the USF & G policy and BFPDE completed operations hazard exclusion. Since the trial court made no determination as to the extent of damages under this theory, we remand for that purpose.

**[¶ 30.] 2. WHETHER THE TRIAL COURT ERRED WHEN IT HELD THAT CORNER WAS NOT ENTITLED TO COVERAGE UNDER ITS CGL POLICY BECAUSE IT FAILED TO PROVIDE USF & G WRITTEN NOTICE.**

■ [¶ 31.] The trial court held that the policies issued by USF & G required written notice and that Corner failed to substantially comply with the policies' written notice provision until after the arbitration proceedings had been completed, resulting in prejudice to USF & G. Corner argues that it immediately informed Ross Roll, an owner of C & R, of the pending arbitration proceeding and inquired as to whether there was coverage for the faulty workmanship of its subcontractors. C & R denies such statements were ever made. The trial court did not address the existence or nonexistence of such statements. Therefore, there is an issue of material fact which should be addressed.

[¶ 32.] If Corner did inform C & R of the arbitration proceeding pending against it, SDCL 59–6–5 is applicable. SDCL 59–6–5 provides:

> As against a principal both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.

Accordingly, we remand for a factual determination on the issue of notice.

**[¶ 33.] 3. WHETHER THE STATUTE OF LIMITATION HAS RUN ON CORNER'S CLAIM AGAINST C & R.**

■ [¶ 34.] C & R claims that Corner's action is barred by the three-year statute of limitation contained in SDCL 15–2–14(3). C & R contends that Corner's negligent misrepresentation claim sounds in negligence and, therefore, falls under SDCL 15–2–14(3). C & R further argues that Corner failed to bring this action within three years of when it alleges C & R negligently informed it that there was no coverage under its insurance policies. C & R argues that the deposition testimony of Corner's president establishes that the alleged advisement from C & R on the issue of coverage was given in September 1992. Corner commenced this action in September 1997. Accordingly, C & R asserts that Corner brought its action two years after the three-year limitation period expired. SDCL 15–2–14(3) provides:

> Except where, in special cases, a different limitation is prescribed by statute,

the following civil actions other than for the recovery of real property can be commenced only within three years after the cause of action shall have accrued:

. . .

(3) An action for personal injury.

[¶ 35.] Corner argues that the six-year statute of limitation contained in either SDCL 15–2–13(1) or 15–2–13(5) is applicable in this case because its claim is based upon a contract, obligation, or liability. SDCL 15–2–13(1) and (5) provide:

Except where, in special cases, a different limitation is prescribed by statute, the following civil actions other than for the recovery of real property can be commenced only within six years after the cause of action shall have accrued.

(1) An action upon a contract, obligation, or liability, express or implied, excepting those mentioned in §§ 15–2–6 to 15–2–8, inclusive, and subdivisions 15–2–15(3) and (4);

. . .

(5) An action for criminal conversation or for any other injury to the rights of another not arising on contract and not otherwise specifically enumerated in §§ 15–2–6 to 15–2–17[.]

The underlying claim appears to be based upon a contract, obligation, or liability and the six-year statute of limitation should apply. This is clearly not an action for personal injury. Furthermore, C & R should not be allowed to take advantage of misrepresentations, if any, in order to avail itself of a shorter statute of limitation.[2] Under these circumstances, it is necessary to remand to the trial court to determine whether such alleged misrepresentations occurred.

[¶ 36.] We affirm Issue 1 in part and remand for factual determination of Issues 1, 2 and 3.

[¶ 37.] GILBERTSON, Chief Justice, and AMUNDSON and KONENKAMP, Justices, and GORS, Acting Justice, concur.

---

2. This Court has stated that "[e]stoppel may be applied to prevent a fraudulent or inequitable resort to a statute of limitations." *L.R. Foy Constr. Co., Inc. v. South Dakota State Cement Plant Comm'n*, 399 N.W.2d 340, 345 (S.D.1987) (holding that it was unjust to allow the defendant to benefit from its misrepresentations and use a shorter statute of limitations to bar the action against it). "[A]n estoppel arises, where, by conduct or acts, a party has been induced to alter his position or do that which he would not otherwise have done to his prejudice." *Id.* (citing *Willadsen v. Crawford*, 75 S.D. 161, 60 N.W.2d 692 (1953)). If a party can prove the essential elements of estoppel the applicable statute of limitation may be tolled. *L.R. Foy Constr. Co., Inc.*, 399 N.W.2d at 344–45. Whether the plaintiff can demonstrate that the defendant's misrepresentations tolled the statute of limitation is a question of fact for the trier of fact. *Id.* at 346.